ELIZABETH W. SNYDER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

RITCHIE A. SNYDER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 28964-87, 28965-87,     Filed November 2, 1989.
3471-88, 3472-88.

530

*Robert E. Schlusser,* for the petitioners.
*Craig A. Etter,* for the respondent.

WILLIAMS, *Judge:* The Commissioner determined deficiencies in petitioners' respective gift taxes in the following amounts for the following periods:

Petitioner Elizabeth W. Snyder
Docket Nos. 28964-87, 3471-88

| Period | Deficiency |
| --- | --- |
| 4/1/81—6/30/81 | $474,643 |
| 7/1/81—9/30/81 | 66,739 |
| 10/1/81—12/31/81 | 59,160 |
| 1982 | 96,902 |
| 1983 | 70,520 |
| 1984 | 77,954 |
| 1985 | 62,047 |

Petitioner Ritchie A. Snyder
Docket Nos. 28965-87, 3472-88

| Period | Deficiency |
|---|---|
| 4/1/81—6/30/81 | $463,122 |
| 1982 | 91,762 |
| 1983 | 63,415 |
| 1984 | 74,361 |
| 1985 | 55,568 |

The issues we must decide are: (1) The fair market value of common stock that petitioner Elizabeth W. Snyder placed in an irrevocable trust for the benefit of her great-grandchildren, and (2) whether petitioner Elizabeth W. Snyder made continuing gifts to the common stockholders by failing either to exercise her option to convert her shares of preferred stock to a class of preferred that accumulated dividends or to tender her shares of preferred stock for redemption, and, if so, in what amounts.

*Preliminary Matter*

We must also address petitioner's motion to strike portions of respondent's reply brief or in lieu thereof to allow petitioners to file a supplemental brief, filed May 22, 1989, to which respondent objected on June 16, 1989. Petitioner asks that references to and quotes from certain technical books and articles be struck from respondent's brief on the grounds that the references constitute references to matters not in evidence and to inadmissible hearsay. Because the books and articles were not proffered, and are not treatises that respondent's expert witnesses relied on or referred to, petitioner requests us not to consider them.

We follow the Federal Rules of Evidence in our proceedings. Sec. 7453. This provides all parties with ground rules for presenting their cases. To depart from these rules not only would contradict our mandated authority but also would prejudice the parties by removing the certainty of what the Court may consider in finding facts. A party could not adequately prepare or defend a case if it were uncertain what standards would be applied to judge the admissibility of evidence. While it is generally accepted that a relaxed application of the rules of evidence during a bench trial

results in less prejudice to the fact finder because of a judge's legal training and experience, the uncertainty of what will be used to find facts is highly prejudicial to a party whether the fact finder is a judge or a jury. Incompetent evidence should not be admitted to proof. We, therefore, believe that adhering to the Federal Rules of Evidence is a sound way to protect the integrity of our proceedings. *Goldsmith v. Commissioner,* 86 T.C. 1134, 1138 (1986).

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted therein and, unless an exception to the hearsay rule explicitly permits its admission, we ordinarily exclude it from evidence. Fed. R. Evid. 801; *Goldsmith v. Commissioner, supra.* The quotes from books and articles to which petitioner objects are hearsay many times over. Respondent offers them so that we might rely on them and apply them to the substantive valuation issues in the case before us. That the information in the books and articles may be opinion does not diminish the necessity for us to conclude that they are truthful and the product of sound analysis of accurate data.

An exception to the hearsay rule allows the introduction of learned treatises in evidence when they have been established as reliable authority by an expert witness at trial and have been either relied upon by an expert witness on direct examination or called to his attention on cross-examination. Fed. R. Evid. 803(18). The certain implication of this exception is that statements from treatises that, (1) have not been established as reliable authority, (2) were not relied on by any expert at trial, or (3) were not called to an expert's attention at trial are not admissible. The books and articles in issue were neither relied on nor referred to by an expert witness at trial. They were not established as reliable authority by any expert. The material that respondent would have us use in finding the value of the common stock is not admissible under the exception to the hearsay rule for learned treatises.

Respondent argues that since the books and articles were not offered at trial, they cannot be considered evidence and thus could not be hearsay. Respondent's references to the books and articles on brief attempts to insert that informa-

tion into the course of our factfinding; there is no other purpose for the references and quotations. Respondent's attempt to introduce this material after trial does not make it any less evidentiary in nature. In fact, the insertion of information into the record by brief underscores one fundamental problem that the hearsay rule is designed to avoid, i.e., the introduction of evidence that may have the appearance of truthfulness without the testing of cross-examination. *Anderson v. United States,* 417 U.S. 211 (1974). Petitioner was denied an opportunity to cross-examine any expert who relied on the books and articles; we were denied an opportunity to consider the relative merits of the opinions expressed by experts who had relied on this material; and we have no basis for evaluating the probative value of this material.

Respondent next urges the Court to take judicial notice of the information contained in the books and articles pursuant to the authority granted under Rule 201, Fed. R. Evid. Rule 201 allows a court to take judicial notice of adjudicative facts which are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The information contained in the material at issue represents theories and conclusions of authors on corporate finance and valuation. These opinions form foundations for the ultimate factual conclusion that respondent believes he has proven. These opinions do not relate to or aid in the interpretation of a statute. Consequently, to take judicial notice of the opinions we must find that they are generally known and are determinable by reference to unimpeachable sources. As discussed in the course of our analysis of the learned treatise exception to the hearsay rule, we have no basis on which to judge the accuracy or reliability of the sources of these opinions. We believe certainly that these opinions are not generally known. In short, this material falls far short of the standards necessary to invoke judicial notice.

Respondent next argues that the inclusion of extraneous information on brief is acceptable at the appellate level as "Brandeis brief" material and ought to be equally acceptable in briefs submitted to this Court. A Brandeis brief is

an "appellate brief in which economic and social surveys are included along with legal principles and citations * * * which takes its name from Louis D. Brandeis, former Associate Justice of Supreme Court, who used such brief while practicing law." Black's Law Dictionary (5th ed. 1979). Respondent does not point to any precedent at the trial level for allowing Brandeis briefs, and indeed we have found none. Our rules of procedure specifically preclude our consideration of this material. Rule 143(b), Tax Court Rules of Practice and Procedure; *Perkins v. Commissioner*, 40 T.C. 330, 340 (1963). Respondent has not offered any justification for abandoning the requisites of the rules of evidence and our rules of practice and procedure in favor of an amorphous "Brandeis brief" rule. Respondent had ample opportunity during trial to introduce these books and articles in a proper manner under the learned treatise exception if his experts believed that they were important. Further, petitioner would have had the opportunity to develop through cross-examination whether the material was useful or persuasive. Without having had this material receive the beneficial scrutiny of the adversary process, we have no way of knowing how to weigh the information and opinions contained in the books and articles. By including these materials in his reply brief respondent is, in effect, attempting to introduce the theories and opinions of several expert witnesses while precluding petitioner from being heard. Simply permitting a reply from petitioner is not a satisfactory answer. Expert testimony is supposed to be an aid to the Court. Fed. R. Evid. 702. We, however, have had no opportunity to examine these "experts" or to see their qualifications. This "Brandeis brief" material erodes the integrity of the adversarial proceeding, and we will not consider "Brandeis brief" material in the course of our factfinding.

Respondent finally argues that the books and articles in issue merely corroborate evidence introduced at trial and thus cannot be considered really evidence. It escapes us how any document or material could "corroborate" any point without also being evidence. Evidence that corroborates other evidence must be offered at trial in its own right. Corroborative evidence that is admitted, far from

being superfluous, is commonly the adhesive of a successful case. Petitioner's motion will be granted.

### FINDINGS OF FACT

Some of the facts are stipulated and are so found. Petitioners Elizabeth W. Snyder (petitioner), and Ritchie A. Snyder resided in Wilmington, Delaware, at the times they filed their petitions. Petitioner Ritchie A. Snyder is a party to this proceeding solely because he consented to have his wife's gifts taxed as though he made half of them.

On March 27, 1981, petitioner incorporated Libbyfam 2, Inc. (Libbyfam), under the laws of the State of Delaware. Libbyfam was organized as a personal holding company, and its sole asset was 300 shares of common stock in W.L. Gore & Associates, Inc. (Gore), a publicly traded corporation. Petitioner transferred the Gore stock to Libbyfam in a tax-free exchange for 1,000 shares of common stock and 2,591 shares of Class A preferred stock on March 30, 1981. At the time of transfer to Libbyfam, the Gore stock was worth $2,592,000 or $8,640 per share. Petitioner's basis in the Gore stock at the time of transfer was $2 per share. Gore was considered to be a "growth stock" because it had historically reinvested profits and paid low dividends.[1] During the years in issue, Gore was a highly successful corporation, owned primarily by members of petitioner's family, which was engaged in the manufacture of electronic wire and cable products, vascular prosthetics and medical products, breathable laminates, sealants, gaskets, filter bags, microfiltration products, and tubing with several domestic plants and several wholly owned foreign subsidiaries. The 300 shares of Gore stock that petitioner transferred to Libbyfam represented less than 1 percent of Gore's total

---

[1]From 1977 to the date of the transfer of the Gore stock to Libbyfam, one share of Gore stock was valued at the following amounts:

| Date | Share value | % Increase over prior value |
|---|---|---|
| 3/31/77 | $48.50 | - - - |
| 3/31/78 | 112.50 | 131.96 |
| 1/17/79 | 175.00 | 55.56 |
| 1/24/80 | 4,950.00 | 2,728.57 |
| 3/30/81 | 8,640.00 | 74.55 |

outstanding shares. Except for the Gore stock and dividends, Libbyfam has never owned any other asset.

According to the articles of incorporation, Libbyfam was authorized to issue three classes of stock: common stock, Class A preferred stock, and Class B preferred stock. The common stock, bearing a par value of $1 per share, possessed exclusive voting rights and was subordinated to both classes of preferred stock in dividend and liquidation rights. The common stockholders had the right to cause any or all of the preferred stock to be redeemed at par value, plus any accrued and unpaid dividends, upon 14 days' notice. The common shareholders were authorized to pay to the preferred shareholders 20 percent of the purchase price in cash and to issue a 5-year promissory note for the remainder, bearing interest at the prime rate of interest charged by the Wilmington Trust Co. on the date of the note.

The Class A preferred stock was entitled to a noncumulative annual dividend of 7 percent of par value, and was convertible, at the option of the holder, into equal numbers of shares of Class B preferred. The Class B preferred stock was entitled to a cumulative annual dividend of 7 percent of par value, payable only after dividends had been paid to the Class A preferred stockholders. After payment of dividends on both the Class A preferred and the Class B preferred, the Class B preferred was entitled to share in any additional dividend declared to the extent of a further noncumulative 5 percent of par value. Class B preferred shareholders could, upon 14 days' notice, require the corporation to redeem Class B shares at par value (the put option) plus accumulated, unpaid dividends payable in cash or by delivery of a 10-year promissory note bearing interest at the then prime rate charged by the Wilmington Trust Co. Both the Class A preferred and the Class B preferred had a par value of $1,000 per share.

On April 2, 1981, petitioner created an irrevocable trust for the benefit of her great-grandchildren that was funded with petitioner's 1,000 shares of common stock in Libbyfam. Petitioner retained 2,951 shares of Libbyfam's Class A preferred stock in a revocable trust. Petitioner intended to arrange ownership of the Gore stock so that

any appreciation was realized by the irrevocable trust. She did not expect to exercise her put option without unanticipated and extraordinary financial need.

From 1981 through 1985 Libbyfam received dividends from Gore and paid out dividends to petitioner, the only Class A preferred shareholder, as follows:

| Year | Dividends received | Dividends paid |
|------|--------------------|----------------|
| 1981 | $1,800 | - - - |
| 1982 | 2,700 | $2,591.00 |
| 1983 | 1,800 | 3,109.20 |
| 1984 | 3,600 | 2,720.55 |
| 1985 | 2,700 | 2,331.90 |

According to the articles of incorporation, the Class A preferred stockholder was entitled to noncumulative dividends of $181,370 or $70 per share annually. The Class B preferred stock was never issued. If petitioner had converted all of her Class A preferred into Class B preferred stock, she would have been entitled to cumulative dividends of $181,370 annually.

By January 1, 1982, the Gore stock had declined in value to $6,700 per share, but by January 1, 1983, it had increased in value to $12,500 per share. From January 1, 1983, through June 30, 1985, the value of Gore stock constantly increased to $17,800 per share. Consequently, had petitioner converted her Class A preferred into Class B preferred, the value of all unpaid dividends on her Class B preferred would have accumulated for her benefit. There would not, however, have been any value in Libbyfam to support the payment of cumulative dividends until September 30, 1982.

Libbyfam paid dividends that were actually less than two percent of the dividends that would have accumulated on Class B preferred. The Libbyfam common shareholders did not receive any dividends.

Petitioner filed a Federal gift tax return for the quarter ended June 30, 1981, in which she reported making a gift of 1,000 shares of Libbyfam common stock to the trust. She reported the value of the gift as $1,000. She did not report any subsequent gifts relating to the Libbyfam common stock in taxable years 1982, 1983, 1984, or 1985. Petitioner Ritchie Snyder filed gift tax returns for the period ending

June 1981 and for calendar year 1982, agreeing to be taxed on one-half of his wife's gifts as if he had made them. He did not file any other gift tax returns during the years in issue but did fill in the consent of spouse line on petitioner's gift tax returns for taxable years 1983, 1984, and 1985.

OPINION

By statutory notice of deficiency dated June 17, 1987, the Commissioner determined a deficiency in petitioner's gift tax for the calendar quarter ending June 30, 1981. The deficiency presumed that the Libbyfam common stock that petitioner donated to the irrevocable trust was worth $2,412,200, rather than $1,000 as petitioner reported on her return. In the alternative, the deficiency notice alleged that petitioner made a gift to the common shareholders when she failed to exercise her put option to redeem her preferred stock. By statutory notice dated November 30, 1987, the Commissioner determined deficiencies in Federal gift tax for quarters ending September 1981 and December 1981 and for taxable years 1982, 1983, 1984, and 1985. Petitioner's husband received statutory notices of deficiency in lesser amounts related to his share of the gifts. All of the deficiencies for taxable years 1982, 1983, 1984, and 1985 were based on the theory that petitioners had made continuing constructive gifts to the common shareholders by declining to exercise the put option. Respondent determined that the values of the constructive gifts were as follows:

| Taxable period | Value of gift |
| --- | --- |
| Quarter ending June 1981 | $123,197 |
| Quarter ending Sept. 1981 | 148,308 |
| Quarter ending Dec. 1981 | 131,466 |
| 1982 | 239,327 |
| 1983 | 177,591 |
| 1984 | 193,874 |
| 1985 | 165,445 |

The first issue for our decision is the fair market value for gift tax purposes of 1,000 shares of Libbyfam common stock that petitioner transferred to an irrevocable trust for the benefit of her great-grandchildren on April 2, 1981. The

parties agree that the value of the 300 shares of Gore stock that was the sole asset of Libbyfam was $2,592,000 at the time of the transfer. They further agree that the sum of the fair market values of all the outstanding shares of Libbyfam stock equaled $2,592,000 on April 2, 1981. They do not agree, however, on the proper allocation of the $2,592,000 value between the common stock that was transferred to the trust and the Class A preferred stock that petitioner retained.

Section 2512(a)[2] provides that, if a gift is made in property, the value of the property at the date of the gift shall be considered the amount of the gift. For purposes of both estate tax and gift tax, fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all the relevant facts. Sec. 25.2512-1, Gift Tax Regs.; sec. 20.2031-1(b), Estate Tax Regs. *McShain v. Commissioner,* 71 T.C. 998, 1004 (1979); *Estate of Heckscher v. Commissioner,* 63 T.C. 485, 490 (1975). The valuation of stock presents a question of fact and the trier of fact must weigh all relevant evidence and draw appropriate inferences therefrom. *Hamm v. Commissioner,* 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court.

It is also well established that the stock of closely held corporations must be discounted for lack of marketability. *Estate of Andrews v. Commissioner,* 79 T.C. 938, 953 (1982); *Estate of Piper v. Commissioner,* 72 T.C. 1062, 1085 (1979). A conceptually distinct discount is allowed for stock which conveys a minority interest in a corporation because the buyer will not be able to control the corporation, compel the payment of dividends, or liquidate it and distribute the assets. *Ward v. Commissioner,* 87 T.C. 78, 103 (1986); *Harwood v. Commissioner,* 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). In determining the value of stock we must also consider restrictions on the free alienation of the stock. *Estate of Reynolds v. Commissioner,* 55 T.C. 172 (1970). The value of

---

[2]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the periods in issue.

stock is determined by reference to a hypothetical willing buyer and willing seller. *Estate of Andrews v. Commissioner, supra* at 954-955.

Petitioner argues that the value of the Libbyfam common stock on April 2, 1981, can only be determined in light of the prevailing rights and powers of the Class A preferred stock that petitioner retained. Because petitioner could have converted her stock into Class B preferred at any time and, on 14 days' notice, have put her Class B preferred stock to the corporation for redemption, petitioner contends that the value of the common stock was no more than what the common stockholder could realize after such redemption. In petitioner's view the common stock had no more value than the remnant interest that it represented.

Respondent counters with the expert witness testimony and report of M. Mark Lee (Lee). Lee, an associate director of corporate finance with Bear, Stearns & Co., Inc., evaluated the Libbyfam stock as if it were a call option on the underlying 300 shares of Gore stock. Lee also based his analysis on the grounds that the common stockholders had the right to call the preferred stock for redemption upon 14 days' notice. Once the preferred stock had been redeemed, Lee reasoned that the Libbyfam common shareholders would have unrestricted access to the underlying corporate assets, the Gore stock.

Lee decided that the common stock was conceptually identical to a call option; for that reason Lee utilized the "Black-Scholes" method of valuation—set forth in "The Pricing of Options and Corporate Liabilities"[3] by Fischer Black and Myron Scholes. The Black-Scholes method is a complex formula which reflects the interrelationship of the fair market value of the stock to be purchased, the exercise price of the option, the amount of dividends to be paid on the stock over the life of the option, the "risk-free" rate of return at the time the option is granted, the volatility of the stock to be purchased, and the term of the option. Based on the Black-Scholes method, Lee determined that the fair market value of an option on the underlying 300 shares of Gore stock would be $470,000, which should be discounted by 25 percent for lack of marketability to

---

[3]Journal of Political Economy, 81 (May-June 1973).

produce a final fair market value of $353,000. Respondent argues that this figure represents the fair market value of the Libbyfam common stock at the time of the transfer. In prior cases we have considered the application of the Black-Scholes method to the valuation of stock options, but we have never applied it to the valuation of common stock.[4]

There are several problems with Lee's analysis. The gravest, by far, is that the Black-Scholes method is designed to value call options, not common stock. In general, the common stock bears the risk of full loss and enjoys the benefit of any future appreciation. An option presents a risk of loss only to the extent of the option price and conveys the right to enjoy potential appreciation in value in corporate ownership for a set and limited time. Black and Scholes define an option as "a security giving the right to buy or sell an asset, subject to certain conditions, within a specified period of time." Common stock represents ownership of the corporation, not simply the potential to acquire it, and in this case the right to control distribution of the corporate assets, in this case, the Gore stock. The right to command distribution of remaining Gore stock (after redeeming the preferred) is not limited by time. An option to purchase has an exercise date, and its limited existence is an important factor in the Black-Scholes method of valuation.

The importance of the time period is evident from the testimony of Joseph P. Baniewicz (Baniewicz), respondent's other expert witness, who also computed the value of the Libbyfam common stock using the Black-Scholes model. Unlike Lee, Baniewicz selected a wide range of time periods reflecting the option's exercise time. His ultimate values for the Libbyfam common stock ranged from $111,532 for a time period of 15 days to $2,412,188 for a time period of 20 years. Interestingly, Baniewicz arrived at a value of $653,552 using a time period of one year, although Lee's computations under the same model for a one-year period produced a value of $470,000. There is no basis for assuming a time period of any particular duration, largely because the objective in this case is to value common stock

---

[4]See *Laureys v. Commissioner*, 92 T.C. 101, 124 (1989); *Pagel, Inc. v. Commissioner*, 91 T.C. 200, 206 n. 7 (1988); *Simmonds Precision Products v. Commissioner*, 75 T.C. 103, 123 (1980).

and not to value an option to purchase. We further note that Mr. Baniewicz also testified that the Black-Scholes method was not a perfect model because the preferred shareholders also had a right to force the redemption of the preferred stock. We believe Mr. Baniewicz' analysis of the unsuitability of the Black-Scholes method for valuing the common stock is sound. Lee's presentation leaves us unpersuaded.

Yet another flaw in Lee's analysis is his assumption that because, with hindsight, it can be said that the common shareholders would be required to sell half the Gore stock to satisfy the 10-year note that would have been held by the Class B preferred shareholder on redemption of her stock, the other half of the Gore stock held by Libbyfam should be treated as having been transferred to the exclusive benefit of the common shareholders. Lee calculated that the amount of dividends paid to Libbyfam, plus half of the Gore stock, were sufficient to satisfy the claims of the Class B preferred shareholder had the put option been exercised 14 days after the transfer. We may, however, consider only that information which would have been reasonably foreseeable to a prospective buyer at the time of the valuation. *Estate of Gilford v. Commissioner*, 88 T.C. 38, 52 (1987); *Estate of Jephson v. Commissioner*, 81 T.C. 999, 1002 (1983). The existence of such value in the future was, on the date of the gift, pure speculation. Indeed, by December 31, 1981 (9 months after the gift), the Gore stock had lost 19 percent of its gift-date value. Furthermore, the value of any asset that is encumbered will be unrealistically inflated if the encumbrance is ignored or discounted by assuming the future existence of extrinsic sources of funds that might be used to satisfy the liability encumbering the asset. Future appreciation in value of the Gore stock cannot be presumed to have existed on the date of the gift.

Lee also employed another analytical model to check his results under the Black-Scholes method. Still treating the Libbyfam common stock as an option to buy the Gore stock, Lee considered the "warrant to stock" price of several publicly traded corporations that were trading at approximately 60 percent to 120 percent of their exercise price. Only one option had the exercise time limit that Lee

was using to measure the value of the Libbyfam common stock, so Lee chose that stock warrant price for purposes of comparison. The warrant was trading at 22.1 percent of the stock price and the Libbyfam common stock would have traded at 18.1 percent of the price of the Gore stock, using Lee's fair market value of $470,000. Lee concluded that his figure was reasonable in comparison. However, an isolated example taken from a group of companies whose warrant to stock prices range between 0.1 percent and 45.6 percent is not persuasive. There was no other evidence offered to indicate that this particular company could be meaningfully compared to Gore or to Libbyfam. We cannot base a decision upon this information. Lee also used one other method, the discounted cash-flow method, which he admits was not an acceptable method for stock valuation at the time of the transfer. Although he claims that the results of this method support his valuation figure, we cannot consider a method that is unacceptable in principle simply because the results of applying it serendipitously coincide with the expert's other analyses.

Petitioner introduced two expert witnesses, Roger B. Orloff (Orloff) and Graham Humes (Humes), who both testified that the value of the Libbyfam common stock on the date of the transfer should be calculated by reducing the value of the corporation by the amount of the value of the preferred stock.

Orloff, who is employed by the Corporate Finance Group of Mellon Bank, considered four factual patterns that could affect the value of the Libbyfam common stock: (1) The common shareholders call the preferred stock for redemption, (2) the corporation liquidates, (3) dividends are paid, and (4) the preferred shareholder exercises her put option. Orloff decided that it was improbable that the common shareholders would force the redemption of the preferred stock because the after-tax proceeds from the sale of the Gore stock would not satisfy the claims of the preferred shareholders. Orloff then determined that if the common stockholders decided instead to liquidate the assets of Libbyfam, they would only have $1,000 left after transferring the assets to the preferred shareholders. Looking at the common stock as a source of future dividends, Orloff noted

that the preferred shareholders would receive all the dividends likely to be paid by Gore, leaving no significant source of value for the common stock. Finally, Orloff determined that if the Class A preferred converted to Class B preferred and put the stock to the corporation, as in the first scenario, the after-tax proceeds of the sale of the Gore stock would leave nothing for the common shareholders except $1,000 after satisfying the claims of the preferred shareholders. Orloff concluded that under existing facts at the date of the gift, the common shareholders could obtain no more than $1,000 in exchange for their common stock. Baniewicz, who testified for respondent, agreed at trial that the value of the Libbyfam common stock on April 2, 1981, was $1,000.

Petitioner's other expert witness, Humes, was employed by Mellon Bank in the Corporate Finance Department and later as a managing director of Legg Mason Wood Walker, Inc. Humes arrived at a value of $1,000 for the Libbyfam common by subtracting the redemption cost of the Class B preferred from the value of the underlying Gore stock. Regardless of which method the common shareholders would choose to satisfy the claim of the Class B preferred shareholders, Humes determined that they would not retain more than $1,000. Humes further noted that the appraisal price of the Gore stock of $8,640 per share reflected the likelihood that the Gore stock would appreciate, "just as the value of any publicly traded stock includes the portion of the price being paid for the right to receive any future appreciation." In conclusion, Humes decided that although the fair market value of the Libbyfam common stock was $1,000, a prospective buyer might have paid as much as $25,000. Humes explained his estimate of $25,000 by saying,

That is not an economic analysis. That is simply my way of saying, having dealt with buyers of privately held blocks of stock for some thirty years, that I believe there might have been buyers out there who would have paid more than $1,000 and maybe they would have paid $10,000. I simply can't imagine anybody paying more than $25,000 but there's no economic analysis of how to get to the $25,000.

Respondent argues that even if we find that the value of the Libbyfam common stock is completely subordinated to

the right of redemption of the Class B preferred stock, we must still consider whether the 10-year note which the common shareholders would issue to redeem the Class B preferred stockholders would be worth its full face value. Although the note would be full-recourse with an interest rate at a prevailing market rate at the time of issuance, respondent suggests that the corporation would not be able to satisfy the note because the sole income generating asset is the Gore stock. This point is not only conjecture but it also proves too much. If Libbyfam could not satisfy the note, there would be no residual value in Libbyfam to inure to the benefit of the common shareholders and no gift.

As we have often noted before, valuation issues are inherently imprecise. *Buffalo Tool & Die Mfg. Co. v. Commissioner,* 74 T.C. 441, 452 (1980); *Messing v. Commissioner,* 48 T.C. 502, 512 (1967). We are not bound by the opinions of experts. *Silverman v. Commissioner,* 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; *Chiu v. Commissioner,* 84 T.C. 722, 734 (1985). We have been given three different figures for the value of the Libbyfam common stock: (1) Lee's $353,000, (2) Orloff's $1,000, and (3) Humes' $25,000. We reject Lee's figure because we reject the application of the Black-Scholes model to the valuation of common stock. Humes found that $1,000 was the fair market value although he guessed that the stock might conceivably be worth as much as $25,000. Finally, Orloff's explanation for limiting the value of the common stock to $1,000 was comprehensive and reasonable. As Orloff demonstrated in his report and Baniewicz stated at trial, if the Class B preferred put option had been exercised, the common shareholders would have realized only $1,000 on the date of the gift, and they had no protection from the exercise of that option. A willing buyer would pay more than $1,000 only with some assurance that the Class B preferred stock would not be redeemed. After consideration of the evidence and expert opinions, we conclude that the value of the Libbyfam common stock was $1,000 on April 2, 1981.

The second issue for our decision is whether petitioner made a continuing gift to the Libbyfam common shareholders by failing to convert her Class A preferred stock to

Class B preferred stock or to put the Class B preferred for redemption. Respondent argues that petitioner's failure to exercise her put option constitutes forbearance from exercising a valuable right that resulted in a gift to the corporation and thus indirectly to the common shareholders. Respondent contends that this situation is controlled by *Dickman v. Commissioner*, 465 U.S. 330 (1984), in which the Supreme Court held that an interest-free demand loan between related parties constituted a gift in the amount of the foregone interest because the use of money is a transferable interest and valuable right in property. Respondent urges us to find that petitioner's failure to exercise her right of redemption constitutes a transfer of the use of property.

In asking us to apply *Dickman* to this case, respondent reads *Dickman* so broadly as to blur the distinction between debt and equity. Although preferred stock manifests some of the characteristics of debt, we cannot say that those characteristics are so close as to warrant the application of *Dickman*. A creditor lends money to a debtor to use without surrendering ownership of the money. Specifically, the lender retains the right to reclaim the money together with a sum paid for its use. That is why the value of an "interest free" loan does not depend on what use the borrower makes of the loan proceeds but on what it would have cost the borrower to obtain the funds in the marketplace. *Cohen v. Commissioner*, 92 T.C. 1039 (1989). A borrower must pay to use the money lent.

On the other hand, an equity interest in a corporation ordinarily gives no certain right to be paid for use of the capital contributed in exchange for the interest. While an equity interest in a corporation may have a right to require the repayment of the contributed capital, the corporation that issued the stock does not have to pay for the use of the property contributed. If payment is made (i.e., dividends), it is discretionary with the corporation's board of directors. An equity contribution to the capital of a corporation is a transfer of ownership in the property to the corporation. Moreover, the value of an equity instrument is in large part determined by the corporation's internal rate of return. The value of using loaned money without cost is

quantifiable and certain because money is fungible and regularly lent, and the cost of borrowing is ascertainable based on what other owners are charging for use of their funds. The value of using property contributed to equity is whatever the corporation can produce from it, not what it would cost the corporation to borrow it. Without comparing corporate performance to some ascertainable and objective measuring rod, one cannot point to a foregone amount of return from equity as *Dickman* instructs us to do with respect to foregone interest on debt. Because corporations usually earn different rates of return for a multitude of reasons, some of which are unique to each corporation, we know of no such measuring rod.

As a general matter, consequently, the *Dickman* holding cannot apply to an equity instrument because an equity investor ordinarily does not have rights analogous to the lender of interest-free loans. The Class B preferred stock that petitioner could have received would have given her the right to put that stock to the corporation for par value plus accumulated dividends. The existence of her put right does not transform her equity interest into debt. The corporation remained always the owner of the Gore stock; it was never a borrower.

By failing to exercise her conversion right, however, petitioner relinquished her right to accumulate unpaid dividends of $181,370 each year. To the extent that the Gore stock increased in value each year sufficiently to have paid the cumulative dividend had the stock been redeemed, petitioner transferred value in such subsequent years to the common shareholders.

Petitioner made a series of gifts of unclaimed dividend accruals to the corporation by failing to exercise her option to convert from Class A preferred stock to Class B preferred stock. Because the corporation was closely held, those gifts were made in effect to the common shareholders. Class A preferred stock earns a noncumulative 7-percent dividend while the Class B preferred earns a cumulative 7-percent dividend. Because she failed to convert to Class B, petitioner waived her right to be paid accumulated dividends on redemption of her stock. If the underlying Gore stock were sufficiently to appreciate in value, petitioner

could permit the foregone dividends that she could have accumulated to enrich the corporation and thus the common shareholders. Unlike an internal rate of return on investment, petitioner's right to cumulative dividends was ascertainable and absolute upon conversion to Class B preferred stock. It was also foreseeable from historical performance and corporate policy that the Gore stock would not generate enough income to pay any significant part of the 7-percent dividend on the Class A preferred. Consequently, an investor seeking protection for the investment in Libbyfam preferred stock would have converted to Class B. We believe petitioner did not convert in order that her great-grandchildren would benefit from avoiding an increasing redemption price prior to the time the preferred stock was retired. Petitioner's failure to convert to stock with a right to cumulative dividends would transfer value to the extent any increased value in the Gore stock would support the payment of the cumulative dividend in redemption, less the amount of dividends actually received for each of the years in issue. Upon exercising the put option, petitioner would receive full value, viz, payments on a promise to pay $2,591,000 plus accumulated dividends deferred payable by a note bearing a market rate of interest, and no further gift would be effected.

Petitioner argues that because there was no sale of Gore stock or liquidation of Libbyfam, no value was realized by the common shareholders from petitioner's failure to convert. In other words, until the value of the Gore stock is actually realized and distributed to the common shareholders, the failure to accumulate dividends transferred no value to the common shareholders. We disagree for two reasons. First, the evidence is that by the end of the third quarter of 1982 and consistently thereafter, there was more than enough increased value to support the dividend that would have been accumulated had petitioner immediately converted her stock to Class B preferred. Second, the absence of having to pay accumulated dividends to the preferred on redemption would directly and positively affect the value of the Libbyfam common stock (which had the right to call the preferred). We agree there was no gift to the common shareholders due to petitioner's failure to convert her stock

to Class B preferred prior to September 1982. As of September 30, 1982, and thereafter, the value of dividends that would have accumulated was effectively transferred to the common shareholders. Because petitioner could have demanded that value by putting her stock at any time after September 30, 1982, the value was transferred on each date a dividend would have accumulated.

Until her death or the exercise of her put option, petitioner had the right to demand from the common shareholders the par value of her Class B preferred holdings plus accumulated unpaid dividends payable over 10 years at the prime rate on the date of the option's exercise. By not exercising this right, respondent argues, petitioner also transferred value to the common shareholders by relinquishing her right to the interest otherwise payable to her in each year.

Respondent argues that value of the continuing gift can be determined by assuming that the put option was exercised the day after the trust was formed. Thus, respondent assumes that the appropriate prime rate is 17 percent, as it was on April 2, 1981, and computes the values that appear in the statutory notice of deficiency as the amount of interest that would have been paid had petitioner put her stock on April 2, 1981. Respondent's theory is seriously defective. Each year that passes without the exercise of the put option requires reference to a new interest rate because the interest rate is not set until the put option is exercised, and the prime rate at Wilmington Trust Co. changes periodically. Consequently, the amount of the gift in each year changes because the interest payable on exercise of the put cannot be determined until it is exercised. More serious is a conceptual flaw. First, petitioner could not transfer both the value of the dividends that would have accumulated on Class B preferred and the value of foregone interest payments had the preferred been redeemed. Petitioner has no right to interest so long as she holds the stock, and she has no right to dividends after putting the stock. Moreover, the value transferred by foregoing interest is not, as respondent argues, the amount of interest that would have been paid but is only the present value of the foregone interest. The present value of

the deferred interest would be more than offset by the dividends that should have accumulated. We believe that this theory is unsound.

In light of the foregoing,

*Decisions will be entered under Rule 155.*