T.C. Memo. 1996-331


UNITED STATES TAX COURT


ESTATE OF ARTHUR G. SCANLAN, DECEASED, RUTH B. SCANLAN,
ADMINISTRATRIX, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4561-95.                    Filed July 24, 1996.


        The parties dispute the value of D's stock in
E on:  (1) The date of D's death and (2) the date of a
gift that was made approximately 3 months beforehand.
A argues that the per-share value was $35.20 on the
date of D's death and $34.84 on the date of the gift.
R determined that the per-share value was $72.15 on
both dates.  <u>Held</u>:  The value on both dates is
$50.50885 per share.


<u>Robert R. Casey</u>, for petitioner.

<u>Linda K. West</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  The Estate of Arthur G. Scanlan, Deceased, Ruth B. Scanlan, Administratrix, petitioned the Court to redetermine respondent's determination of a deficiency in Decedent's Federal estate tax.  Respondent determined a $426,111 deficiency.

The parties dispute the value[1] of Decedent's stock in Eatelcorp, Inc. (Eatel), on:  (1) The date of his death and (2) the date of a gift that was made approximately 3 months beforehand (these two dates are collectively referred to as the Valuation Dates).  Ruth B. Scanlan, Administratrix (Administratix), argues that the per-share values were $35.20 at Decedent's death and $34.84 on the date of the gift.  Respondent determined that the per-share value was $72.15 on both dates.

We hold that the per-share value was $50.50885 on both dates.  Unless otherwise stated, section references are to the Internal Revenue Code in effect for the Valuation Dates. Rule references are to the Tax Court Rules of Practice and Procedure.  Dollars, unless otherwise noted, are rounded to the nearest dollar.

FINDINGS OF FACT

---

[1] Throughout this Memorandum Opinion, we sometimes use the shorthand "value" to refer to fair market value.

Decedent died on July 16, 1991, while domiciled in Gonzales, Louisiana. Administratrix is his surviving spouse, and she is the administratrix of his estate.[2] At the time of Decedent's death, he owned an undivided 50-percent community interest in 50,000 shares of Eatel voting stock. Eatel, which was formerly Data and Telecommunications Co., Inc. (DATA),[3] is a telecommunications company that provides the following services through its wholly owned subsidiaries: Telephone services, telecommunications and electronic equipment sales, answering and secretarial services, and administrative services. On the Valuation Dates, Eatel's wholly owned subsidiaries were: (1) East Ascension Telephone Co., Inc., (2) H & E., Inc., (3) Advanced Tel., Inc., and (4) Eatelnet, Inc.

Eatel's outstanding stock on the Valuation Dates consisted of 868,200 shares of voting stock and 96,466 shares of nonvoting

---

[2] We do not know where Administratrix resided at the time of the petition.

[3] The parties have not explained (and the record does not reveal) whether the change from DATA to Eatel was merely one in name, or whether it stemmed from a corporate acquisition or reorganization. Although petitioner's counsel stated during trial that "The name [of DATA] was changed [to Eatel] as of August 31, [1989]," there is no evidence in the record to support that statement. See United States v. Kane, 887 F.2d 568, 572 n.5 (5th Cir. 1989) (statements by counsel are not evidence); U.S. Holding Co. v. Commissioner, 44 T.C. 323, 327 (1965); Danco Co. v. Commissioner, 17 T.C. 1493, 1497 (1952); Lyon v. Commissioner, 1 B.T.A. 378 (1925). Indeed, a valuation report that petitioner's expert prepared on DATA as of Aug. 31, 1989, appears to disprove the statement of petitioner's counsel. The expert's report refers to DATA as "DATA", and it makes no reference to a name change to Eatel.

stock. None of this stock was registered with either the Securities & Exchange Commission or the office of the Louisiana Blue Sky Commissioner. None of this stock was publicly traded.

Eatel had approximately 30 shareholders on the Valuation Dates. Most of its shares were owned by: (1) Decedent's family (Scanlan Family), who owned approximately 37.1 percent of Eatel's stock, (2) the Banker family, who owned approximately 35 percent of Eatel's stock, and (3) the King family, who owned approximately 14 percent of Eatel's stock.

On April 12, 1991, Administratrix gave six members of her family a total of 10,667 shares of Eatel voting stock, which were her separate property.[4] Decedent "split" these gifts with Administratrix for Federal gift tax purposes, see sec. 2513, and a 1991 Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, was filed on his behalf on or about January 14, 1992. Decedent's Form 709 reported each share's value at $34.84. This value was based on a valuation report (1989 report) prepared by Chaffe & Associates, Inc. (C & A), an investment banking firm in New Orleans, Louisiana, and signed on November 15, 1989, by its founder and president, David Blackshear Hamilton Chaffe III (Mr. Chaffe). The 1989 report reflected C & A's appraisal of DATA as of August 31, 1989, which was performed to "establish the fair market value * * * of DATA in

---

[4] At least one of these donees, namely, John D. Scanlan, was already a shareholder of Eatel.

non-marketable, minority blocks of shares."[5]  Decedent's Form 709

shows that the value of $34.84 per voting share as of April 12,

1991 (the date of the gift), was ascertained by:  (1) Starting

with a value of $30,500 per voting share as of August 31, 1989,

as stated in the 1989 report, (2) adjusting that value for a

1000-for-1 stock split in June 1990, yielding a value of $30.50

per share, and (3) increasing the latter figure by $4.34, to

reflect an increase in book value per voting share from

December 31, 1989, until December 31, 1990.

On February 1, 1992, a Form 706, United States Estate (and

Generation-Skipping Transfer) Tax Return, was filed on

petitioner's behalf.  Petitioner's Form 706 reported the

date-of-death value of Decedent's Eatel stock at $35.20 per

share.  This amount was based on a two-page valuation report of

C & A, signed by Mr. Chaffe on October 21, 1991 (1991 report).

C & A prepared the 1991 report by relying heavily on its 1989

report.  The 1991 report also states that C & A:  (1) Reviewed

Eatel's certified financial statements for its calendar years

ended December 31, 1989 and 1990, as well as Eatel's uncertified

financial statements for the 7-month period ended July 31, 1991,[6]

(2) discussed with Eatel's president Eatel's past, present, and

future business decisions, as well as the state of the

---

[5] The 1989 report states that DATA has 21 shareholders.

[6] C & A also looked at the relevant financial statements of
Eatel's subsidiaries.

telecommunications industry, and (3) compared Eatel with nine publicly traded companies in the telephone or telecommunications industry. C & A calculated ratios for price/earnings, price/cash-flow (after tax), price/revenue, and price/equity by referring to the median ratios of the minority interests of the publicly traded companies. C & A used these median ratios to conclude that Eatel's marketable minority value on July 16, 1991, was $52 million. C & A chose a 35-percent marketability discount and multiplied this discount by the $52 million figure to conclude that Eatel's "nonmarketable minority value" was $33.8 million; i.e., $35.20 per share for Eatel's outstanding shares on July 16, 1991.

In September 1992, Eatel's board of directors solicited offers to purchase all of Eatel's stock or assets. By letter dated January 12, 1993, MDJ Communications, Inc., offered to buy all of Eatel's stock for $65 million. By letter dated January 13, 1993, Telephone and Data Systems, Inc., offered to buy all of Eatel's stock for $48.2 million, "plus the assumption of the existing indebtedness" (which was at least $25,547,938 on December 31, 1992). By letter dated January 15, 1993, Century Telephone Enterprises, Inc., offered to buy all of Eatel's stock for $65-75 million. By letter dated March 26, 1993, Brighton Communications Corp. (Brighton), offered to buy all of Eatel's stock for $72.5 million; i.e., $75.1555 per share.

Following Brighton's offer, the Scanlan Family, which then consisted of Decedent's descendants and Administratrix, exercised their right of first refusal and caused Eatel to enter into an agreement with each shareholder who was not a member of the Scanlan Family (Other Shareholders) to sell his or her shares to Eatel at the $75.1555 per-share price offered by Brighton. On August 30, 1993, the Other Shareholders agreed with the Scanlan Family to have their shares redeemed at $75.1555 per share. In January 1994, Eatel redeemed all of the stock of the Other Shareholders, which was 62.9 percent of Eatel's outstanding stock at that time.

Based on the redemption price, respondent determined that each share of Eatel's voting stock was worth $72.15 on July 16, 1991. In the case of Decedent, respondent reduced the $72.15 value by 4 percent to account for his minority interest in the company, a minor increase in earnings between the date of his death and the date of the redemption agreement, and the deflation of the dollar from the date of the redemption agreement to the date of Decedent's death. Respondent also used this formula to set the value of the donated stock at $72.15 per share, and she increased Decedent's taxable gifts accordingly.

DATA's 1984 through 1987 net income (after taxes) was $423,225, $854,085, $894,990, $369,009, respectively, and its net income (after taxes) for the 6-month period ended December 31,

1987, was $734,710.[7]  Eatel's (or DATA's, as the case may be) 1988 through 1992 net income (after taxes) was $6,380,390, $4,015,870, $5,148,594, $5,491,633, and $6,587,602, respectively. Eatel paid dividends of $1 per share in 1990, $2 per share in 1991, and $2.50 per share in 1992.  Neither Eatel nor DATA paid any dividends before August 31, 1989.[8]

There were no sales or redemptions of Eatel stock between 1989 and 1994.

OPINION

1.  Relevancy

Before turning to the primary issue of valuation, we must decide a relevancy objection raised by petitioner (and submitted to and filed by the Court as a written motion) as to stipulations and other evidence relating to the:  (1) Offers in 1993 to purchase all of Eatel's stock and (2) redemption of the Other Shareholders' stock at $75.1555 per share.  Petitioner argues that this evidence (the disputed evidence) is irrelevant for purposes of determining value on the Valuation Dates because: (1) There were no agreements, offers, or negotiations on the Valuation Dates to sell all of Eatel's stock or assets; (2) the

---

[7] The 6-month period stemmed from DATA's change to the calendar year from a fiscal year ended June 30.  An income statement included in Exhibit 3 erroneously lists this 6-month period as ended on June 30, 1987.

[8] We are unable to determine Eatel's net income (before taxes) or dividends for 1993 because the record does not reveal Eatel's financial data for that year.

offers were for all of Eatel's stock, whereas the issue at hand concerns minority interests; (3) Eatel's 1992 earnings per share increased by more than 27.9 percent over its 1990 earnings per share and by more than 19.95 percent over its 1991 earnings per share; (4) petitioner's expert concluded that the price-earnings multiples of comparable publicly traded telecommunications corporations increased by more than 50 percent between the date of Decedent's death and March 1993; and (5) petitioner's expert concluded that the premiums paid in 1993 for the stock of publicly traded telecommunications corporations were more than 52 percent above the prices at which minority blocks were then trading.

We disagree with petitioner that the disputed evidence is irrelevant to our determination herein. Federal law favors the admission of evidence, and the test of relevancy under Federal law is designed to reach that end. Rule 401 of the Federal Rules of Evidence, a rule that applies to this Court under Rule 143(a), Tax Court Rules of Practice and Procedure, provides broadly that evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401 of the Federal Rules of Evidence favors a finding of relevance, and only minimal logical relevancy is necessary if the disputed fact's existence is of consequence to the determination of the action. Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579, 587 (1993).  As stated by the Court of Appeals for the Fifth Circuit:  "federal law favors the admission of probative evidence.  In fact, (t)he Federal Rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value at all.  Doubts must be resolved in favor of admissibility." Sabatino v. Curtiss Natl. Bank, 415 F.2d 632, 635-636 (5th Cir. 1969) (citations and internal quotation marks omitted).

We find the disputed evidence probative to our determination of value on the Valuation Dates.  The best indicator of the value of unlisted stock often is arm's-length sales of that stock at or around the time of valuation, Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979), and the disputed evidence reflects the mechanics of an arm's-length sale between a willing buyer and willing, unrelated sellers.  Contrary to petitioner's wishes, we will not turn our backs to this evidence simply because the dates of the offers and the redemption agreement were more than 1 year from the Valuation Dates.  See Jayson v. United States, 294 F.2d 808, 810 (5th Cir. 1961) (3-1/2 years not too remote); Estate of Thompson v. Commissioner, 89 T.C. 619, 628-629 (1987), revd. on other grounds 864 F.2d 1128 (4th Cir. 1989); see also Estate of Jung v. Commissioner, 101 T.C. 412, 430-432 (1993), and the cases cited therein.  This passage of time, as well as the financial data referenced by petitioner and the fact that the

offer was for all of Eatel's stock, are factors that we must consider in harmonizing the offering and redemption prices with the value of the subject shares on the Valuation Dates.  We recognize that the value of the subject shares must be determined as of the Valuation Dates, and that the probative weight of future events must be discounted accordingly.  Sec. 20.2031-1(b), Estate Tax Regs.; see also Estate of Jung v. Commissioner, supra at 430-432; Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).  As this Court stated in Estate of Jung v. Commissioner, supra at 431-432:

> for purposes of determining fair market value, we believe it appropriate to consider sales of properties occurring subsequent to the valuation date if the properties involved are indeed comparable to the subject properties.  * * *
>
> Of course, appropriate adjustments must be made to take account of differences between the valuation date and the dates of the later-occurring events.  For example, there may have been changes in general inflation, people's expectations with respect to the industry, performances of the various components of the business, technology, and the provisions of tax law that might affect fair market values * * * [between the valuation date and the subsequent date of sale].  Although any such changes must be accounted for in determining the evidentiary weight to be given to the later-occurring events, those changes ordinarily are not justification for ignoring the later-occurring events (unless other comparables offer significantly better matches to the property being valued).  [Citations and quotation marks omitted.]

We will deny petitioner's motion to exclude the disputed evidence, and we turn to the valuation issue bearing this evidence in mind.

## 2. Value of Property

For Federal estate tax purposes, property includable in a decedent's gross estate is valued on either: (1) The date of the decedent's death or (2) the alternate valuation date as provided under section 2032. Secs. 2031(a) and 2032(a); sec. 20.2031-1(b), Estate Tax Regs. For Federal gift tax purposes, property is valued on the date of the gift. Sec. 2512(a); sec. 25.2512-1, Gift Tax Regs. In both cases, value is a factual determination for which the trier of fact must weigh all relevant evidence and draw appropriate inferences and conclusions. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938); Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Fair market value is the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under a compulsion to buy or to sell. Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); McDonald v. Commissioner, 764 F.2d 322, 329 (5th Cir. 1985), affg. T.C. Memo. 1983-197; Snyder v. Commissioner, 93 T.C. 529, 539 (1989); Estate of Hall v. Commissioner, 92 T.C.

312, 335 (1989).  The willing buyer and the willing seller are hypothetical persons, instead of specific individuals or entities, and the characteristics of these imaginary persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer.  Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, supra at 218.

Special rules govern the valuation of corporate stock.  When stock is listed on an established securities market, the stock's value usually equals its listed market price.  When stock is not listed on an established securities market, the stock's value is usually based on arm's-length sales (if any) that have occurred within a reasonable time of the valuation date.  In the absence of any such arm's-length sales, the value of unlisted stock is based on the value of listed stock of the subject corporation, or, if the corporation has no listed stock, the listed stock of like corporations engaged in the same or a similar line of business.[9]  Unlisted stock must also be valued by reference to the subject corporation's net worth, its prospective earning power, its dividend-earning capacity, its goodwill, its management, its position in the industry, the economic outlook for its industry, the degree of control represented by the block

---

[9] Like corporations are determined by reference to the subject corporation's age, business (e.g., manufacturer, retailer), product line, and gross receipts.

of its stock to be valued, and the amount and type of its nonoperating assets if not considered elsewhere. Sec. 2031(b); Estate of Andrews v. Commissioner, supra at 940; Estate of Hall v. Commissioner, supra at 336; Duncan Indus., Inc. v. Commissioner, supra at 276; sec. 20.2031-2(f), Estate Tax Regs.; see also Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion __ F.3d __ (3d Cir., June 10, 1996).

Respondent did not call an expert at trial to support her determination that the value of the subject stock was $72.15 per share on the Valuation Dates. Petitioner called its expert, Mr. Chaffe, to support its asserted values, and the Court received his expert report into evidence.[10] See Rule 143(f). Mr. Chaffe has been involved with the securities industry since 1959. His expert report consisted of: (1) The 1991 report, (2) the 1989 report, (3) a consolidated balance sheet and income statement of Eatel and its subsidiaries for the years 1984 through 1990 (with a column for "7/31/91 Annualized"), (4) a one-page "Comparative Analysis", which lists nine publicly traded companies in the telephone or telecommunications industry, and sets forth certain financial data with respect to each of them, (5) five pages of Mr. Chaffe's worksheets on the value of Eatel as a single company, and (6) six pages of Mr. Chaffe's worksheets

---

[10] At the outset, we note that the expert report deals only with the date-of-death value.

- 15 -

on the value of Eatel under a "two company analysis used by us
[C & A] as an additional check on value."

Petitioner argues that it must prevail in this case because
respondent did not call an expert to contradict Mr. Chaffe's
testimony.  We disagree.  Petitioner must prove that respondent's
determination of the subject values is incorrect.[11]  Rule 142(a);
Welch v. Helvering, 290 U.S. 111, 115 (1933).  The fact that
respondent did not call an expert at trial to support her
determination does not mean that petitioner has met its burden of
proof.  Although Mr. Chaffe testified as an expert in this case
on petitioner's behalf, we will not follow his opinion if it is
contrary to our judgment.  We may adopt or reject his opinion in
its entirety, if we believe it appropriate to do so, or we may
select the portions of his opinion that we choose to adopt.
Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627-628
(1944); Helvering v. National Grocery Co., supra at 294-295;
Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp., 71 F.3d
198, 204 (5th Cir. 1995); Dixon v. International Harvestor Co.,
754 F.2d 573, 580 (5th Cir. 1985); Parker v. Commissioner,
86 T.C. 547, 562 (1986).

_____

[11] Petitioner has implied throughout this proceeding that
respondent's determination is invalid because it is not supported
by an appraisal.  Although petitioner did not argue this issue on
brief, we note in passing that we disagree.  This argument has
previously been considered by the Court, and we have rejected it.
See, e.g., Brigham v. Commissioner, T.C. Memo. 1992-413; see also
Tripp v. Commissioner, 337 F.2d 432, 434-435 (7th Cir. 1964),
affg. T.C. Memo. 1963-244.

We reject Mr. Chaffe's opinion.  He is unhelpful to us in resolving the issues herein.  We were unimpressed by his testimony during trial, and we are unpersuaded by the conclusions reached in his expert report.  Mr. Chaffe was unable to answer coherently many questions raised by the Court on conclusions reached in his reports, and he was unable to explain certain parts of the analysis contained in the reports.  He arbitrarily applied a 35-percent marketability discount to the subject shares.  He did not adequately discuss the publicly traded companies which he compared to Eatel, and he did not set forth their age, business, or product line with any specificity.  He made no mention of a hypothetical buyer or a hypothetical seller, and, indeed, we read his expert report to be skewed in favor of a low value for the stock.

Mr. Chaffe relied primarily on his 1989 report to ascertain the value set forth in the 1991 report.  We are unpersuaded that the company valued in 1989 (DATA) was sufficiently similar to the company valued in 1991 (Eatel) to make such reliance reasonable.  Whereas the 1989 report states that Mr. Chaffe toured DATA's facilities on October 10, 1989, there is nothing in his testimony or the 1991 report to suggest that he did likewise before preparing the 1991 report, or that he took any other meaningful step to independently verify that Eatel's operation in 1991 was the same as DATA's operation in 1989.  Indeed, the 1991 report is silent with respect to Eatel's then-current business.  Although

the 1991 report states that C & A discussed Eatel's business decisions with Eatel's president, neither the 1991 report nor the record as a whole reveals the substance or extent of those discussions.

Even assuming, arguendo, that DATA's and Eatel's operations were similar enough to allow Mr. Chaffe to rely reasonably on his 1989 report, we find other faults with the 1991 report. First, the 1991 report does not adequately account for the fact that Eatel's 1991 earnings increased dramatically over DATA's earnings for the years covered by the 1989 report. Second, the 1991 report does not adequately take into account that Eatel began paying dividends after the time covered by the 1989 report. Third, the 1991 report makes no reference to the 1989 report's statement that DATA's disposition in 1988 of a second-tier subsidiary did away with a business that had a negative effect on earnings; e.g., the 1991 report does not discuss the effect of that disposition on Eatel's 1991 net worth. Fourth, the 1989 report evidences an anticipated growth of DATA's subsidiaries by 1991 through incorporation of technology, transformation, and changes in operation, yet the 1991 report does not discuss the results of this anticipated growth or its effect on Eatel's net worth. Fifth, the 1989 report explains that "the large increase in 1988 income was the result of a single sale of stock held by the Company [DATA] which resulted in a pre-tax gain of approximately $4,752,417 which was invested in temporary cash

investments."  But neither the 1989 report nor the 1991 report explains the dramatically higher net income (after taxes) for years after 1988, as compared to years before.  Sixth, the 1991 report refers to the financial data of publicly traded companies, nominally in similar lines of business, yet never explains how those companies were selected, or in what respects the lines of business were similar to Eatel's.[12]  Although Mr. Chaffe testified at trial that the publicly traded companies in the 1989 report were "essentially the same" as the companies used for the 1991 report, he also testified that these companies may have changed from 1989 "through merger acquisition or something like that."

The 1991 report states that the shares of Eatel are not marketable, yet fails to explain sufficiently why this is so. Mr. Chaffe testified at trial that "There are very rare exceptions when there is any willing buyer at all at any price for minority shares of a nonpublicly-traded company".  This testimony is unsupported by the record, unpersuasive by itself, and implausible.  We find that the shares were marketable.  As a point of fact, the 1989 report notes that some shares of DATA

---

[12] In this regard, we give little weight to the conclusions of Mr. Chaffe that:  (1) The price-earnings multiples of comparable publicly traded telecommunications corporations increased by more than 50 percent between the date of Decedent's death and March 1993, and (2) the premiums paid in 1993 for the stock of publicly traded telecommunications corporations were more than 52 percent above the prices at which minority blocks were then trading.

were sold in 1985, and a 1986 gift tax return reports that a corporate competitor of DATA had offered to buy a former shareholder's minority interest in DATA (approximately 23.8 percent) at a premium in 1985. We also note that Eatel's 21 shareholders in 1989 grew to approximately 30 on the Valuation Dates.

Although we reject Mr. Chaffe's opinion in full, we do not believe that the value of the subject stock was $72.15 on both dates, as respondent determined. We find incredible that the 4-percent discount reflected in the notice of deficiency adequately accounts for both a marketability and minority discount, as well as the change in the setting from the date of the redemption agreement to the date of Decedent's death. We proceed to determine the value of the stock on the Valuation Dates. The record does not allow us to make a precise determination of the stock's values; thus, we rely on our common sense, knowledge, and experience to help us ascertain these values. Valuation, which is simply an approximation, is inherently imprecise and usually capable of resolution only by a Solomon-like pronouncement. Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; Phillips Petroleum Co. v. Commissioner, 104 T.C. 256, 309 (1995); Messing v. Commissioner, 48 T.C. 502, 512 (1967).

We start with the redemption price of $75.1555 because we believe that it represents the arm's-length value for all of Eatel's stock in August 1993. We adjust this price to account for the passage of time, as well as the change in the setting from the date of Decedent's death to the date of the redemption agreement. We also adjust this price to take into account the marketability and minority discounts. In an ideal world, these two discounts are computed separately, as are the alterations for the change in setting. See Snyder v. Commissioner, 93 T.C. at 539. In the confines of our imperfect record, however, we are unable to determine these discounts with any specificity and choose to account for them and the other factors in the aggregate. Based on the record, and with the benefit of our common sense, knowledge, and experience, we find and conclude that the redemption price must be reduced by 30 percent to reflect the value of the subject shares on the date of Decedent's death. Accordingly, we hold that the date-of-death value is $50.50885 per share.

We find no material alteration in the value of the shares between the date of the gift and the date of death. Thus we find that the date-of-gift value equals the date-of-death value. Accordingly, we hold that the date-of-gift value is $50.50885 per share.

We have considered all arguments made by the parties.  To the extent that we have not discussed any of their arguments, we have found them to be without merit.

To reflect the foregoing,

<u>An appropriate order will be issued denying petitioner's motion to exclude the disputed evidence and decision will be entered under Rule 155</u>.