T.C. Memo. 1999-231

UNITED STATES TAX COURT

ESTATE OF FRANK A. BRANSON, DECEASED,
MARY M. MARCH, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10028-95.                          Filed July 13, 1999.

<u>Robert A. Mills</u>, <u>Marco L. Quazzo</u>, and <u>Mary Catherine Wirth</u>, for petitioner.

<u>Rebecca T. Hill</u>, <u>Bryce A. Kranzthor</u>, and <u>Elizabeth Groenewegen</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined a deficiency of $756,564 in petitioner's Federal estate tax.

The issues for decision are: (1) Whether the fair market value of 12,889 shares of Savings Bank of Mendocino County (Savings) on the date of decedent's death was $300 per share as respondent determined in the notice of deficiency; $181.50, as petitioner reported on its estate tax return; or some other amount. We hold it was $276 per share. (2) Whether the fair market value of 500 shares of common stock of Bank of Willits (Willits) on the date of decedent's death was $850 per share, as respondent determined in the notice of deficiency; $485 per share, as petitioner reported on its estate tax return; or some other amount. We hold it was $626 per share. (3) Whether, under section 2053,[1] petitioner may deduct certain expenses incurred in defending its reporting position. We hold it may.

                            FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and second supplemental stipulation of facts, and the accompanying exhibits are incorporated herein by this reference.

Petitioner is the estate of Frank A. Branson (decedent), who died testate on November 9, 1991, in Mendocino, California. Mary

---

[1]All section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

March (March), decedent's daughter, is the executrix and residuary legatee of the estate. March's legal address was Potter Valley, California, at the time the petition in this case was filed.

A.  Decedent's Stock Acquisitions

Decedent inherited 12,369 shares of Savings stock and 1,143 shares of Willits stock from his wife, Charlotte, in 1983. The balance of the Savings shares owned by decedent at the time of his death was obtained either as gifts from his father-in-law or by purchase.

B.  Savings Bank of Mendocino

1.  Background

In 1991, Savings was headquartered in Ukiah, California, and had seven branch offices. Savings was founded on November 28, 1903, by Judge J.M. Mannon (J.M.) and a few other investors who contributed $50,000 in total to the venture. J.M. was elected president of Savings in 1914, and upon his death in 1926, his son, Charles M. Mannon (C.M.), who was also one of the original stockholders, was named president of Savings. C.M. was the father of Charlotte, decedent's wife. Decedent began working for Savings in 1935, and served as its president from 1964 until 1976, when he became a director. At the time of trial, Charles B. Mannon (Mannon), the grandson of C.M. and decedent's nephew

and March's cousin, was president and chief executive officer of Savings and a director and the chairman of the board of Willits.

Savings' stock is not traded on any established exchange or over-the-counter market.

2.  Net Income

For the 12 months that ended on October 31, 1991, Savings had net income of $4,149,000.  For the years 1986 through 1990,[2] Savings had net income as follows:

| Year | Net Income |
|------|------------|
| 1986 | $2,531,000 |
| 1987 | 2,825,000 |
| 1988 | 3,048,000 |
| 1989 | 3,128,000 |
| 1990 | 3,481,000 |

Savings' net income increased on average by approximately 10.39 percent per annum for the 5 years preceding decedent's death.

Savings has never had a negative income year.  Earnings for 1991 were the best ever.  Furthermore, provisions for loan losses decreased from $670,000 (3.6 percent of total interest income) in 1986, to $310,000 (1.1 percent of total interest income) in 1991. Thus, during this time, provisions for loan losses decreased both on an absolute basis and as a percentage of interest income.

---

[2]The results of the years 1986 through 1990 are for 12 months that ended on December 31.  Net income for the 12 months that ended on Dec. 31, 1991, was $4,278,207, which is 23 percent higher than the same period in 1990.

3.  Dividend History

Savings has a consistent history of paying dividends.  For the 12 months that ended on October 31, 1991, Savings paid common stock dividends of $8.40 per share.  For the years 1986 through 1990, Savings paid dividends as follows:

| Year | Dividends Paid Per Share |
|------|------|
| 1986 | $4.60 |
| 1987 | 5.60 |
| 1988 | 6.60 |
| 1989 | 7.20 |
| 1990 | 7.80 |

Thus, dividends paid increased every year for the 5 years preceding decedent's death, on average by approximately 12.8 percent per annum.

4.  Total Assets and Shareholder's Equity

At all relevant times, Savings has had 100,000 shares of common stock issued and outstanding.  As of October 31, 1991, Savings had total assets of $295,428,000 and shareholder's equity of $28,344,000.

As of December 31, 1986 through 1990, Savings had total assets and shareholder's equity as follows:

| Year | Total Assets | Shareholder's Equity |
|------|--------------|----------------------|
| 1986 | $200,959,000 | $15,757,000 |
| 1987 | 228,705,000 | 18,023,000 |
| 1988 | 243,348,000 | 20,410,000 |
| 1989 | 266,638,000 | 22,817,000 |
| 1990 | 281,322,000 | 25,515,000 |

Thus, total assets and shareholder's equity increased on average by approximately 8.0 and 12.46 percent per annum, respectively, for the 5 years preceding decedent's death.

5.  Ownership

At the date of valuation, the shares of Savings stock were distributed among 215 shareholders as follows:

| Shareholder | No. of Shares | Percentage |
|-------------|---------------|------------|
| Estate of Frank A. Branson | 12,889 | 12.89 |
| Charles B. Mannon | 16,716 | 16.72 |
| Everett & Martha Coe | 17,355 | 17.35 |
| Others[1] | 53,040 | 53.04 |
| Total | 100,000 | 100.00 |

[1]The shares held by others are widely distributed, with many of the shareholders owning less than 3 percent.

6.  Sales of Savings Stock

The investment department of Savings maintains an informal list of people who are interested in buying shares of its stock. Usually, when a shareholder wants to sell his or her shares, the shareholder contacts Savings, which informs the shareholder of the most recent sale price and the current book value of the stock.  Savings then assists the shareholder in finding a buyer willing to pay the price that the shareholder requires. Historically, Savings shares have traded at or near book value.

Since 1980, there have been several sales of blocks of several hundred shares.  In each of these sales, the shares changed hands on a single day and all the shares traded for the

same price per share, although most of the buyers each purchased less than 100 shares. No blocks of Savings stock comparable to the size owned by petitioner have ever been sold; the only shareholders who have ever owned blocks of that size are members of the Mannon family or their relatives, and none of them have ever tried to sell their entire interests.

However, on October 9, 1991, decedent sold a total of 1,111 shares for $307 per share to approximately 20 buyers; the book value on October 31, 1991, was $283.44 per share. On August 27, 1992, petitioner sold 2,800 shares for $335 per share to approximately 45 buyers;[3] the 1992 third-quarter book value was $321.74 per share.[4] Savings assisted petitioner in this sale, and petitioner made no attempt to sell these shares in any way other than through Savings.

---

[3]The stipulated amount of this sale is $935,000 (which is $333.93 per share); however, the amount reported on petitioner's Form 1041, U.S. Fiduciary Income Tax Return, for 1992 is $938,000 ($335 per share). Furthermore, at trial respondent introduced evidence, a list of sales of Savings shares after 1989 and a list of sales of Savings shares from 1980 through 1992, which show the price per share was $335. While stipulations are not set aside lightly, we have broad discretion in determining whether to hold a party to a stipulation. See Blohm v. Commissioner, 994 F.2d 1542, 1553 (11th Cir. 1993), affg. T.C. Memo. 1991-636. The evidence in the record demonstrates that the stipulated amount is simply incorrect. We are not bound by stipulations of fact that appear contrary to the facts disclosed by the record. See Rule 91(e); Blohm v. Commissioner, supra. We, therefore, find as a fact that the 1,111 shares were sold for $938,000 ($335 per share) on Aug. 27, 1992.

[4]24 The Western Bank Monitor 123 (1993).

C.  Bank of Willits

   1.  Background

   Willits has two branches and provides a full range of banking services to individual and commercial customers.  Willits was incorporated on April 11, 1904, and began business with $50,000 of paid-in capital.  Decedent's father-in-law, C.M., was Willits' president from 1928 until 1957.  Willits' stock is not traded on any established exchange or over-the-counter market.

   2.  Net Income

   For the 12 months that ended on September 30, 1991, Willits had net income of $819,000.  For the years 1986 through 1990,[5] Willits had net income as follows:

| Year | Net Income |
|------|------------|
| 1986 | $624,000 |
| 1987 | 659,000 |
| 1988 | 714,000 |
| 1989 | 711,000 |
| 1990 | 734,000 |

   Thus, net income increased on average by approximately 5.59 percent per annum during the 5 years preceding decedent's death. Furthermore, except for 1989, net income increased every year.

   During this time, the provision for loan losses increased from $55,000 in 1986 to $70,000 in 1991; however, it decreased as

_____

   [5]The results of the years 1986 through 1990 are for 12 months that ended on December 31.

a percentage of total interest income from 1.41 percent in 1986 to 1.29 percent in 1991.

3.  Dividend History

Willits has a history of paying dividends.  Dividends paid increased each year during the 5 years preceding decedent's death.  For the 12 months that ended on September 30, 1991, the dividends were $29 per share.  For the years 1986 through 1990, Savings paid dividends as follows:

|  | Dividends Paid |
| Year | Per Share |
| 1986 | $18 |
| 1987 | 22 |
| 1988 | 24 |
| 1989 | 26 |
| 1990 | 28 |

Thus, dividends paid increased during this measurement period on average by approximately 10.01 percent per annum.

4.  Assets and Shareholder's Equity

At all relevant times, Willits had 8,000 shares of common stock issued and outstanding.  As of September 30, 1991, total assets were $54,929,000 and shareholder's equity was $6,448,000.

As of December 31, 1986 through 1990, Willits had total assets and shareholder's equity as follows:

| Year | Total Assets | Shareholder's Equity |
| 1986 | $40,665,000 | $4,013,000 |
| 1987 | 41,442,000 | 4,496,000 |
| 1988 | 47,540,000 | 5,017,000 |
| 1989 | 52,290,000 | 5,236,000 |

1990          54,666,000                    5,716,000

Thus, total assets and shareholder's equity increased each year during the 5 years preceding decedent's death; total assets increased on average by approximately 6.20 percent per annum and shareholder's equity by 9.94 percent per annum.

5.  Ownership

At the date of valuation, the shares of Willits stock were distributed among 48 shareholders as follows:

| Shareholder | No. of Shares | Percentage |
|---|---|---|
| Estate of Frank A. Branson | 500 | 6.25 |
| Charles B. Mannon | 2,441 | 30.51 |
| Everett & Martha Coe | 1,414 | 17.68 |
| Others[1] | 3,645 | 45.56 |
| Total | 8,000 | 100.00 |

[1]Of the shares held by others, 19.9 percent are owned by two out-of-State shareholders and the balance by local residents who own very small percentages.

6.  Sales of Willits Stock

Historically, very few Willits shares have been traded each year.  A total of 1,062 shares changed hands in 22 transactions from February 1980 until the valuation date.  No shares were sold during 1987 or for more than 4 years after April 1988.  Most of the sales were by Willits board members either to Willits employees, board members, or directors, or to induce qualified persons to become board members or officers.  For instance, in 1980 a total of 64 shares was traded in four sales, 60 of those shares were sold as qualifying shares by a board member to three

persons hired by Willits; two as executive officers and one as a director. Similarly, the only shares that changed hands in 1981 were 20 qualifying shares, which Mannon sold as an inducement to a new board member; in 1982, the only shares traded were 20 shares sold by a departing executive officer to an incoming officer. The most recent sale before the valuation date was Mannon's sale of 20 qualifying shares to Dick Bozarth (Bozarth) on March 23, 1988, for $500 per share.

Consequently, in these 22 transactions there were only six sellers and three buyers who were not Willits employees, board members, or directors. Most of the sellers, with the exception of decedent, sold few shares; decedent sold 674 shares. Most of the buyers, with the exception of Mannon, purchased minimal interests. Mannon was a buyer in seven of the sales and purchased a total of 663 shares; 572 from members of his family and 91 from other sellers.

Historically, Willits shares have traded at or near book value. For instance, decedent sold 174 of the Willits shares in 1984 for $56,550 ($325 per share) and 500 shares between December 1985 and January 1986 for $190,000 ($380 per share).[6] The

---

[6]The parties stipulated that decedent sold 424 shares for $151,550 ($357.43 per share) in 1985. However, this stipulation is contrary to a buyer's (Mannon's) testimony and a list of all the sales of Willits shares from 1980 through 1992, which was offered into evidence as a joint exhibit. The evidence in the
(continued...)

selling price of these shares was near their book value. The book value of the Willits stock on September 30, 1991, was $806 per share.

Petitioner sold 500 shares on August 12, 1992, for $425,000 ($850 per share). The book value of the shares on July 31, 1992, was $875 per share. Petitioner did not independently value the shares before the sale; rather, March and Mannon used the book value of the stock as a reference to set the sale price.

Furthermore, petitioner did not contact or engage any brokers or agents for this sale. Instead, March asked Mannon to find buyers for the stock. Mannon confined his search for buyers to the Willits board of directors. Rebecca Brown, an executive officer and shareholder, bought 10 shares; Bozarth, a board member and shareholder, bought 125 shares in the name of his logging company; and Mannon bought 365 shares (10 of which he gave to a longtime employee).

D. Petitioner's Sales and March's Recognition of Gain

Under decedent's will, the 12,889 shares of Savings stock and the 500 shares of Willits stock were distributed as follows: (1) 4,000 shares of Savings stock in trust for the benefit of

---

[6](...continued)
record demonstrates that the stipulation is incorrect. We, therefore, find as a fact that decedent sold 500 shares for $380 per share between December 1985 and January 1986. See supra note 3.

decedent's widow during her life, and upon her death, the remainder to be distributed to March; (2) 1,000 shares of Savings stock in trust for each of decedent's four grandchildren; and (3) the remaining 4,889 shares of Savings stock and 500 shares of Willits stock to March as part of the residue of the estate. The will provided that all estate taxes were to be paid from the residue of the estate.

Pursuant to a court order, March was granted authority to sell 2,800 shares of Savings stock at $335 per share and 500 shares of Willits stock at $850 per share. March sold the shares and paid Federal and State of California estate taxes of $1,008,698 and $200,632, respectively. March, as executrix and residuary legatee, assumed individual liability for any estate taxes later found due from petitioner.

Petitioner reported the value of the Savings and Willits shares as $181.50 and $485, respectively, per share, on its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. Petitioner reported the capital gain from the sales of the Savings and Willits shares on Schedule D of its 1992 Form 1041, U.S. Fiduciary Income Tax Return, which it filed on or about April 15, 1993. Petitioner calculated the gain by subtracting the value of the shares reported on the estate tax return from the amount received from their sale. Petitioner reported $429,800 of gain from the sale of the Savings shares and

$182,500 from the sale of the Willits shares.[7] Petitioner, however, did not pay any tax on these gains; instead, it reported a net long-term capital gain distribution of $610,274 to March on Schedule K-1, Beneficiary's Share of Income, Deductions, Credits, Etc., which it attached to the Form 1041.

March and her husband, Charles March, filed their 1992 Form 1040, U.S. Individual Income Tax Return, using the status of "Married filing joint return", on or about April 15, 1993, and paid the tax due. March reported the $610,274 gain on line 13 of Schedule D, which was attached to the Form 1040, as "Net long-term gain or (loss) from partnerships, S corporations, and fiduciaries".

E. Petitioner's Claim for Deductions

After filing the Form 706, petitioner paid $21,226 of attorney's fees, $8,830 of accountant's fees, and $12,396 of appraisal costs to defend its reporting position in an audit by the Internal Revenue Service. Petitioner filed Form 843, Claim for Refund and Request for Abatement, to claim a refund of the estate tax paid on these amounts. In addition, petitioner filed a protective claim for refund of estate tax for additional

---

[7]Petitioner also reported $6,955 of long-term capital gain from the sale of 2,000 shares of PG&E stock and a $738 net long-term capital loss carryover from 1991. The value of the PG&E shares and the loss carryover are not at issue in this case.

administrative expenses that it expects to incur in further defending its position.

OPINION

Respondent determined a deficiency of $756,564 in petitioner's 1991 Federal estate tax. Respondent's determination was based upon his contention that the date-of-death fair market values of the 12,889 Savings shares and the 500 Willits shares were $3,866,700 ($300 per share) and $425,000 ($850 per share), respectively. Respondent now argues that the values of the Savings and Willits shares were no less than $3,776,477 ($293 per share) and $386,000 ($774 per share), respectively. Respondent's determination as to the fair market value of the subject property is presumptively correct, and petitioner bears the burden of proving that the fair market value is lower. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioner asserts that the values it reported on its return for the Savings shares, $2,339,354 ($181.50 per share), and the Willits shares, $242,500 ($485 per share), are correct; however, it argues that if this Court decides that there is a deficiency, it is entitled to equitable recoupment of the tax paid on the gain recognized by March due to the lower bases provided by the values petitioner reported on its estate tax return.

Finally, petitioner asserts that it is entitled to deduct certain expenses from the value of the gross estate. The

expenses are attorney's fees, accountant's fees, and appraisal costs which were incurred after the estate tax return was filed to prove the shares' reported values.

Fair Market Value

Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. See United States v. Cartwright, 411 U.S. 546, 551 (1973); Propstra v. United States, 680 F.2d 1248, 1251 (9th Cir. 1982); sec. 20.2031-1(b), Estate Tax Regs. This is an objective test and requires the property to be valued from the viewpoint of a hypothetical buyer and seller, each of whom would seek to maximize his or her profit from any transaction involving the property. See Propstra v. United States, supra at 1251-1252; Estate of Jung v. Commissioner, 101 T.C. 412, 438 (1993). Profit maximization must be achieved in the context of the market conditions and the constraints of the economy existing at the valuation date. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

For Federal estate tax purposes, the fair market value of the subject property is generally determined as of the date of death of the decedent; ordinarily, no consideration is given to any unforeseeable future event that may have affected the value of the subject property on some later date. See sec. 20.2031-

1(b), Estate Tax Regs.; see also First Natl Bank of Kenosha v. Unites States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Newhouse v. Commissioner, supra; Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987).

The question of "Valuation of stock for tax purposes is a matter of 'pure fact.'" Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963) (quoting Penn v. Commissioner, 219 F.2d 18, 20-21 (9th Cir. 1955)), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, supra at 217; see also In re Nathan's Estate v. Commissioner, 166 F.2d 422, 425 (9th Cir. 1948) (the question of fair market value for tax purposes is ever one of fact and not of formula), affg. a Memorandum Opinion of this Court dated July 17, 1946.

While listed market prices are the benchmarks in the case of publicly traded stock, in determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. See Estate of Fitts v. Commissioner, 237 F.2d 729, 731 (8th Cir. 1956), affg. T.C. Memo. 1955-269; Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979); Estate of Campbell v. Commissioner, T.C. Memo. 1991-615; sec. 20.2031-2(b), Estate Tax Regs.

If it is established that the value of any share of stock determined on the basis of selling price does not reflect the fair market value thereof, then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair market value.  See sec. 20.2031-2(e), Estate Tax Regs.

Issue 1.  Fair Market Value of the Savings Shares

The parties agree that the best indication of the Savings stock's market value is the actual sale price of the shares. Petitioner, however, asserts that the actual sale price is just the starting point for deciding fair market value--that discounts should be applied to the sale price for minority interest, lack of marketability, and blockage.  Respondent contends that the actual sale price reflects the discount for minority interest and lack of marketability.  Respondent further contends that in view of the higher prices received for the shares sold in the post-death market, no significant discount for blockage is appropriate.  We agree with respondent.

Expert Witnesses

Both sides submitted expert witness reports and presented expert witness testimony in regard to the value of decedent's shares of Savings stock at the date of death.

Expert witness testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or

judgment. See Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989). The Court, however, is not bound by an expert's opinion. We weigh an expert's testimony in light of his or her qualifications and with respect to all credible evidence in the record. Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept selective portions of it. See Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994). Moreover, where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We have broad discretion in selecting valuation methods, see Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason", see Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of the Court.

Where necessary, we may reach a determination of value based upon our own examination of the evidence in the record. See

Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285). Finally, because valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific testimony, provided it is within the range of figures that properly may be deduced from the evidence. See Silverman v. Commissioner, supra; Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178. With these principles in mind, we consider the experts' opinions.

Petitioner's Expert's Opinion

Petitioner's expert is John R. Gasiorowski (Gasiorowski). Gasiorowski is the director of Arthur Anderson & Co. Valuation Services in Northern California, and he has had extensive experience in valuing businesses. In his report, Gasiorowski used the market and income methods to value petitioner's Savings shares.

The market method measures the value of an asset through an analysis of recent sales or offerings of comparable property. If comparable publicly traded companies can be found, then the stock prices for those companies can be used to derive benchmarks, such as financial ratios, which can be applied to the corresponding financial measures of the subject company to derive a value for its stock.

In applying this method, Gasiorowski first selected eight publicly traded banks with overall characteristics similar to Savings as "guideline companies". He then compared the guideline companies' operating results and financial positions from 1986 through the third quarter of 1991 with Savings' operating results and financial positions for the same time period. On the basis of this comparative analysis, Gasiorowski selected certain financial ratios to value the Savings shares. Giving equal weight to the price-to-earnings ratios, the price-to-book ratios, and the price-to-dividend ratios, Gasiorowski concluded that the "marketable minority value" of the Savings stock was $295 per share, before considering a discount for lack of marketability. The marketable minority value is Gasiorowski's "best estimate of what the Savings Bank stock might sell for if it were publicly traded."

The income method values an asset based upon the present value of its future economic benefits. To estimate the value of the Savings shares with this method, Gasiorowski interviewed Savings' management concerning the bank's future, and obtained its 1992 budget. Gasiorowski developed the discount rate used to calculate the present value of Savings' 1992 estimated net income by reducing the rate of return that he thought an equity investor in Savings would require by 4 percent, his estimate of Savings' long-term growth rate. Using this method, Gasiorowski concluded

that the shares were worth $350, before considering a discount for lack of marketability.

Because Gasiorowski considered the market method data to be more reliable than the income method data, he gave the market method result greater weight, and concluded that the marketable minority value of the stock was $310.

Finally, Gasiorowski applied a 30- to 45-percent discount to the estimated marketable minority value for lack of marketability and liquidity.  In selecting the size of the discount, Gasiorowski considered various studies of the differences between the private transaction prices for restricted shares of a corporation and the contemporaneous sales prices for publicly traded shares of the same corporation (the restricted stock studies),[8] and a series of initial public offering (IPO) studies that compared the prices of shares sold in an IPO to the prices of shares in the same corporation sold in relatively small amounts no more than 5 months earlier in private transactions (the IPO studies).[9]

_____

[8]Restricted stock is stock acquired from an issuer in a transaction exempt from the registration requirements of the Federal securities laws.  Sales of restricted stock are generally restricted within the first 2 years after issuance.

[9]This was a series of updates to a study by John D. Emory. The most recent, Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock--November 1995 through April 1997", Bus. Valuation Rev. (Sept. 1997), was

(continued...)

To narrow the range of the discount, Gasiorowski considered Savings' 1991 revenues, positive earnings history, positive dividend growth history, payout ratio, and the expected long-term growth rates of its earnings and dividends.  Gasiorowski concluded that these factors indicated that a discount at the lower end of the range would be appropriate, before considering the size of the block held by petitioner.

In considering the appropriate discount for the size of the block, Gasiorowski estimated that, based on the average number of shares traded in the 4 prior years, it would take petitioner more than 8 years to dispose of all its shares unless it was willing to sell them at a significant discount.[10]  Accordingly, Gasiorowski tentatively concluded that a discount of 40 to 45 percent should be applied to the $310 indicated value, which resulted in a value of $170 to $186 per share.

---

[9](...continued)
the eighth in the series.

[10]At trial, Gasiorowski denied using the term "blockage" in his report.  However, we note that in his written report, Gasiorowski opined that "it would be difficult to sell the 12,889 shares held by the Estate without incurring a significant discount for the sale of the entire block."  Furthermore, Gasiorowski testified that "after considering the size of the block, we thought the discount for lack of marketability would be in the 40 to 45 percent range."  Thus, it is evident that when Gasiorowski considered the marketability of the Savings shares, he considered the effect of blockage, and that his estimate of the discount for lack of marketability includes a component for blockage.

However, before reaching a definite conclusion of the stock's value, Gasiorowski interviewed several experts who value closely held bank stocks. From his discussions with these experts, Gasiorowski concluded that if a block of stock of the size held by petitioner were publicly traded, it most likely would trade at 55 to 60 percent of book value. Applying this discount to the October 31, 1991, book value of the Savings stock suggested a public market value of $156 to $170 per share. Thus, Gasiorowski concluded that the date-of-death fair market value of petitioner's shares was $170 per share. We do not find petitioner's opinion persuasive.

Discounts for a Minority Interest and Lack of Marketability

A minority interest discount reflects the minority shareholder's inability to compel either the payment of dividends or liquidation in order to realize a pro rata share of a corporation's net earnings or net asset value. A lack of marketability discount reflects the fact that there is no ready market for shares in a closely held corporation. Thus, discounts for a minority interest and for lack of marketability are conceptually distinct, and the appropriate percentage rate of each of them is a question of fact. See Estate of Newhouse v. Commissioner, 94 T.C. at 249. Gasiorowski concluded that if the stock were publicly traded, the value of a minority interest would be $310 per share. This estimated value reflects the

discount for a minority interest in Savings; therefore, the 45-percent discount that Gasiorowski would apply to the estimated value must be for only the lack of marketability of petitioner's block of shares.

We find Gasiorowski's reliance on the restricted stock studies for the size of the discount factor to be misplaced, since the studies analyzed only restricted stock that had a holding period of 2 years. The Savings shares were not restricted either by law or by agreement. The fact that Savings maintained a waiting list of willing buyers is evidence that the stock's history of low trading volume is due to the shareholder's preference to hold Savings shares for investment, rather than for sale. As the investment time horizon of an investor in Savings stock evidently is long term, we do not believe that marketability concerns rise to the same level as a security with a short-term holding period like a restricted stock. See Furman v. Commissioner, T.C. Memo. 1998-157. Therefore, we find no persuasive evidence in the record to support reliance on the restricted stock studies in determining an appropriate marketability discount.

Furthermore, we do not find Gasiorowski's conclusions with respect to the IPO study persuasive. The IPO study compared the sales prices of relatively small amounts of a corporation's shares before they were offered to the public to the sales prices

of the same shares sold later in an IPO.  The study concluded that the sales prices in the nonpublic markets were 40 to 45 percent less than sales prices in the IPO's.  Thus, Gasiorowski concluded that the estimated marketable minority value, which he implicitly assumes is equal to an IPO value, should be reduced by 45 percent to reflect the nonpublic market value of the shares. We reject this conclusion for the following reasons.

Petitioner offered no evidence that the value of the shares was affected by any change in the market conditions, the constraints of the economy, or the financial condition of Savings between the date of decedent's arm's-length sale of 1,111 shares for $307 per share in the nonpublic market and the valuation date 1 month later.  Consequently, if we apply the conclusions of the IPO study to the case at hand, we find that it is more likely that $307 is 40 to 45 percent less, rather than more, than the price at which the same shares would sell in an IPO.

Furthermore, Gasiorowski disregards the fact that the actual sales value of the shares is nearly identical to his estimated marketable minority value.  The near identity of values indicates that the marketability of the Savings shares in the nonpublic market is essentially equal to that of a minority interest in the public market, in which case no discount for marketability is required for a minority interest in Savings.

Discount for Blockage

Finally, Gasiorowski considered the lack of marketability due to the size of the block of shares held by petitioner.

The discount for blockage is based upon the theory that a large block of stock cannot be marketed and turned into cash as readily as a few shares; also, where there is only a limited market for a stock, offering a large block of the stock depresses the market and lowers the price that can be obtained. See Estate of Sawade v. Commissioner, T.C. Memo. 1984-626, affd. 795 F.2d 45 (8th Cir. 1986); Richardson v. Commissioner, 151 F.2d 102, 103 (2d Cir. 1945), affg. a Memorandum Opinion of this Court; Phipps v. Commissioner, 127 F.2d 214, 216 (10th Cir. 1942), affg. 43 B.T.A. 1010 (1941); Safe Deposit & Trust Co. v. Commissioner, 35 B.T.A. 259 (1937), affd. 95 F.2d 806 (4th Cir. 1938); sec. 20.2031-2(e), Estate Tax Regs.[11]  However, there is no

---

[11]In this regard, sec. 20.2031-2(e), Estate Tax Regs., provides:

In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued.  If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations.  * * *

presumption of blockage. See Maytag v. Commissioner, 187 F.2d 962 (10th Cir. 1951), affg. a Memorandum Opinion of this Court; du Pont v. Commissioner, 2 T.C. 246, 255 (1943); Safe Deposit & Trust Co. v. Commissioner, supra. Blockage is not a law of economics, a principle of law, or a rule of evidence. Blockage is a question of fact. See Estate of Sawade v. Commissioner, supra; Estate of Christie v. Commissioner, T.C. Memo. 1974-95. "If the price obtainable for a block of stock is influenced by the size of the block, the existence and extent of this influence must be proven." Estate of Christie v. Commissioner, supra. Petitioner bears the burden of proof in this regard. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); sec. 20.2031-2(e), Estate Tax Regs.

In valuing a block of stock, we are not required to assume that the entire block was dumped on the market at one time on the valuation date. Rather, the inquiry must be directed to the effect upon the market based on the assumption that the block was being fed out into the market during a reasonable period of time. See Estate of Van Horne v. Commissioner, 78 T.C. 728, 742 (1982), affd. 720 F.2d 1114 (9th Cir. 1983); Avery v. Commissioner, 3 T.C. 963, 971 (1944); Estate of Sawade v. Commissioner, supra. What is a reasonable period of time depends upon all the facts and circumstances. See Estate of Sawade v. Commissioner, supra.

Gasiorowski concluded that, because of the stock's history of low trading volume, it would be difficult to dispose of petitioner's block of shares without incurring a significant discount or devaluing the holding by dribbling it into the local market over a period of time exceeding 8 years. We do not agree with this conclusion.

Evidence of the quantity of shares that can be sold without depressing their price is relevant to determining the magnitude of the discount, if any, that should be applied to their value for blockage. Therefore, we consider the number of shares that were sold within a reasonable time of decedent's death, as well as the price at which they sold, indicative of the fair market value of the shares at the valuation date.

Gasiorowski based his estimate of the amount of time it would take petitioner to dribble its stock into the local market on the average number of shares sold per year during the 11 years prior to decedent's death. We have found that the waiting list of willing buyers maintained by Savings is evidence that the stock's low trading volume is due to the shareholder's preference for holding the shares for investment, not the lack of willing buyers. By averaging the sales volumes of the prior years, Gasiorowski diluted the evidence of the number of shares that have been sold by willing sellers to willing buyers at any particular time with the total number of shares that were offered

for sale over 11 years.[12]  Furthermore, we have stated that later-occurring events that evidence fair market value may be taken into account.  See <u>Estate of Jung v. Commissioner</u>, 101 T.C. at 431; see also <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. at 218 n.15.  In estimating the number of shares that could be sold per year, Gasiorowski did not consider petitioner's sale of 2,800 shares less than 10 months after the date of decedent's death.  Accordingly, we find little in Gasiorowski's methodology to support his opinion of the length of time it would take to dispose of petitioner's shares.

As an alternative to dribbling petitioner's shares into the local market, Gasiorowski considered the consequences of disposing the block in the public market.  Gasiorowski interviewed several experts who value closely held bank stocks for their opinion of the price at which petitioner's stock would trade if it were offered on the public market.  The experts' opinion was that the stock could be expected to trade at a price ranging from 50 to 70 percent of book value, and most likely at a

---

[12]For instance, 228 shares changed hands in 1990, 1,534 in 1991, and 3,000 in 1992.  The average number of shares sold per year over this 3-year period is almost 7 times the number sold in 1990, and is about one-half the number of shares sold in 1992.  Thus, the average number of shares sold per year over the 3-year period does not necessarily represent the number of shares sold in any particular year, or by a willing seller at any time.

price of 55 to 60 percent of book value.[13]  Considering the

nonpublic market that existed at the relevant time and the prices

for which Savings shares actually were sold,[14] we think it

extremely unlikely that any willing seller, not under any

compulsion to sell and seeking to maximize his or her profit,

would choose to sell his or her shares in the public market at a

45-to 50-percent discount from book value.  We reject this

portion of petitioner's expert opinion.

Respondent's Expert's Opinion

Respondent's expert is Herbert T. Spiro (Spiro).  Spiro is

the president of American Valuation Group, Inc., and he has

performed many valuations for respondent in the past.  In his

report, Spiro considered the actual sales values and used the

market and income methods to value petitioner's Savings shares.

Spiro ultimately concluded that the fair market value of the

stock was $3,776,477 ($293 per share).

Spiro found seven publicly traded bank companies that were

sufficiently comparable to Savings to use for the market method

of valuation.  Employing a methodology similar to that used by

---

[13]The experts assumed that only petitioner's shares would be
offered on the public market.

[14]The total number of shares that changed hands during the
12 months beginning on Oct. 9, 1991, is 4,136.  This amount
includes the 1,111 shares sold by decedent and the 2,800 sold by
petitioner.  All these shares sold for more than book value.

petitioner's expert, Spiro selected certain financial ratios to value the Savings shares. Placing primary weight on the price-to-earnings ratio, secondary weight on the price-to-book ratio, and little weight on the dividend yield measure, Spiro concluded that the "indicated value" of a minority interest in Savings would be $369 per share, if the shares were liquid and freely traded.

Because the shares are not quickly convertible into cash, Spiro applied a liquidity discount to the indicated value.[15] To determine the size of the liquidity discount, Spiro considered several studies,[16] and reviewed 19 opinions of this Court that were decided after 1983 in which we found a discount separately and specifically for either lack of marketability or restrictions on transfer with respect to a closely held company. The discounts in the studies and cases ranged from 10 to 45 percent.

---

[15]We note that in this case, a liquidity discount and a discount for lack of marketability are conceptually indistinguishable.

[16]Spiro relied on the following studies: Pratt, "Discounts and Premia", Valuation of Closely Held Companies and Inactively Traded Securities (1990); Maher, "Discounts for Lack of Marketability for Closely Held Business Interests", 54 TAXES 562 (Sept. 1976); Moroney, "Most Courts Overvalue Closely Held Stocks", 51 TAXES 144 (Mar. 1973); Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock", Bus. Valuation Rev. (Dec. 1986); and Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock (January 1994 through June 1995)", Bus. Valuation Rev. (Dec. 1995).

Spiro next considered the particular facts and circumstances of the Savings stock, including the existing market for the stock, the rising price trend of the traded shares, Savings' history of paying increasing dividends, and the lack of restrictions on trading the shares. Spiro concluded that a liquidity discount of 20 percent was appropriate and that under the market method the fair market value of the stock was $295.27 per share.

To incorporate the actual sales value into his analysis, and to reflect the amount of time it would take to sell a block of shares the size of petitioner's, Spiro assumed that the shareholder could go to a lender and hypothecate the block for a loan. To repay the loan, the shareholder would sell the shares over the next 8 years and 3 months at a rate equal to the number of shares that were sold on average per month during the first 10 months of 1991. Spiro estimated the prices for which the shares would sell in future years by increasing the actual price at which decedent sold 1,111 shares in 1991 by a factor that was a conservative reflection of the historic growth rate of the stock's book value. In this calculation, Spiro included his estimation of the cash-flow from future dividends paid. Finally, Spiro assumed that the shareholder would pay 2 percentage points above the prime rate, which was 7.5 percent at the date of valuation, for the loan. Therefore, he calculated the present

value of the cash-flow from the stock sales and dividends using 9.5 percent as a discount factor.

Using this piecemeal sales method, Spiro concluded that the "implied price per share" was $308. This amount represents an illiquid minority value and requires no further adjustment.

To value the shares by the income method, Spiro capitalized Savings' 1992 pro forma cash-flow. To make this determination, Spiro made certain assumptions regarding Savings' 1992 net interest income, provision for loan losses, other operating income and expenses, income taxes, and additions to equity capital. Spiro developed the discount rate he used to calculate the present value of the estimated cash-flow by reducing the rate of return that he thought an equity investor in Savings would require by 7 percent, his estimate of Savings' long-term growth rate.

Using this method, Spiro concluded that the minority value of the stock was $331 per share, before considering a liquidity discount. After applying the 20-percent liquidity discount, Spiro concluded that the fair market value of the stock was $266 per share.

To reconcile the results of the different methods, Spiro calculated the weighted average of the different values. Spiro assigned the results of the piecemeal sales method 40 percent of the total, the market method 35 percent, and the income method 25

percent. Spiro concluded that the fair market values of petitioner's stock was $293 per share.

We reject part of respondent's expert's opinion and accept part. In the market method section of his written report, Spiro stated that the "P/E ratio[17] is principally influenced by earnings growth, with higher-growth companies trading on average at higher P/E ratios." Spiro chose a price-to-earnings ratio for Savings by comparing Savings' 1-year and 3-year growth trends to the average of the selected companies' growth trends, and derived a share price of $373.41 from that ratio.

In analyzing the data Spiro used to derive this value, we find no statistically significant correlation between the seven selected companies' growth trends and their price-to-earnings ratios.[18] Using the average of these companies' growth trends to

---

[17]Price-to-earnings ratio.

[18]The selected companies and their growth trends and price-to-earnings ratios are as follows:

|  | Growth Trends | | |
| Company | 1-Year | 3-Year | P/E Ratios |
| --- | --- | --- | --- |
| California Bancshares, Inc. | -18.73 | 5.58 | 11.02 |
| Civic Bancorp | -32.32 | 22.91 | 7.95 |
| First Commercial Bancorp | -25.91 | 11.64 | 5.75 |
| The Pacific Bank | 2.11 | -1.24 | 8.01 |
| Redwood Empire Bankcorp | 148.56 | 32.22 | 9.02 |
| University National Bank | 1.54 | 3.21 | 9.64 |
| Westamerica Bancorporation | 14.35 | 38.99 | 9.05 |

There is no significant correlation between the companies' growth rates and price-to-earnings ratios. Spiro's data does not
(continued...)

determine a price earnings multiple for Savings is akin to a navigator averaging compass points chosen at random to plot a course.  We reject this part of Spiro's opinion, because the data he used does not support his conclusion.

We reject Spiro's reliance on the restricted sales and IPO studies for the same reasons we have already expressed in addressing the opinion of petitioner's expert.

We do not agree with the implied share value that Spiro obtained using his piecemeal sales method.  To calculate this value, Spiro assumed that a lender would make the same assumptions as he did regarding the future values of the shares, the amount of the dividends, and the number of shares that could be sold per year, and that the lender would make a loan equal to 100 percent of the present value of the future cash-flow, which would be secured in total only by the shares.

We think that a lender would require the entire block of stock as security for a loan equal to only a part of the stock's value;[19] therefore, a loan for the total amount of the value of

---

[18](...continued)
support his premise that the price-to-earnings ratio is principally influenced by earnings growth, or that knowledge of a company's net income growth trend helps to predict its price-to-earnings ratio.  See Freund & Smith, Statistics: A First Course, 441 (4th ed. 1986); Kroeber & LaForge, The Manager's Guide to Statistics and Quantitative Methods, 147-148 (1980).

[19]Spiro conceded at trial that the stock would not secure
(continued...)

the shares would, in part, have to be otherwise secured.  The interest rate charged the borrower for the portion of the loan not secured by the Savings shares (the unsecured portion) would depend upon the creditworthiness of the borrower.  The actual interest rate would thus be a weighted average of the rates charged for the secured and unsecured portions of the loan.  Consequently, the actual interest rate would vary depending upon the creditworthiness of the particular borrower.

By using a valuation method that is dependent upon the interest rate available to a particular borrower, instead of the market rate of return required by investors in this type of security, Spiro calculated the value of the stock to a particular borrower, not the fair market value of the shares.

Finally, we disagree with Spiro's estimate of the amount of time it would take to dispose of the shares for the same reason we disagreed with petitioner's estimate.[20]

We think that the actual sales value of the 1,111 shares sold at arm's length to unrelated parties 1 month before decedent's death provides the best indication of the value of the shares.  The price at which these shares sold reflects the

---

[19](...continued)
the entire amount of the loan.

[20]Spiro noted in his written report that his estimate is "conservative in light of the fact that [petitioner] sold * * * 2,800 shares in 1992".

market's appreciation of the value of a minority interest in Savings stock and its awareness of the stock's limited marketability.

Moreover, no evidence was offered of any change in the market conditions, the constraints of the economy, or the financial condition of Savings between the date of decedent's sale of 1,111 shares and the date of petitioner's sale of 2,800 shares that would have affected the demand for the shares. Thus, the fact that decedent's block of shares sold quickly once it was offered, and that approximately 10 months later petitioner's larger block of shares sold equally quickly, indicates that the market for Savings' shares is considerably more liquid than either petitioner or respondent opined.

However, although Mannon testified that after petitioner's sale some of the buyers expressed an interest in purchasing more shares, he also testified that others could have bought no more. Furthermore, although the blocks of stock sold by decedent and petitioner sold quickly and the shares in petitioner's sale sold for a higher price than the shares in decedent's earlier sale, the amount by which the actual sales price exceeded book value was slightly less in the later sale than in the earlier sale.[21]

[21]Decedent sold 1,111 shares at 8.31 percent above book value; petitioner sold 2,800 shares at 4.12 percent above book value.

Therefore, the number of Savings shares that can be sold without affecting price is uncertain, but not unlimited.

The facts and circumstances of this case indicate that a 10-percent discount for blockage is appropriate. Accordingly, we find that the fair market value of petitioner's Savings stock is $276 per share.

Issue 2. Fair Market Value of the Willits Shares

Respondent determined that the value of petitioner's Willits stock was $850 per share; however, he now contends that the date-of-death fair market value of petitioner's Willits stock is $774 per share. Respondent bases his contention on the results of petitioner's sale of all its shares approximately 9 months after decedent's death.

Petitioner asserts that the value of the stock is $485 per share, but concedes on brief that the evidence supports a valuation in the range of $485 to $662 per share. Petitioner further asserts that the sales history of Willits' stock is evidence that there is no market for the shares, and that the price it received for the shares is not representative of their fair market value because the shares were not sold at arm's length.

Petitioner sold its 500 shares of Willits stock for $850 per share; 365 of the shares were purchased by Mannon. At the time he purchased the shares, Mannon owned more than 30 percent of

Willits' outstanding shares, and was a director and chairman of the board of Willits, March's cousin, and decedent's nephew. Mannon testified that he bought the shares even though he did not want them, because March was a family member, the estate taxes were due, and he could not find another buyer.

We previously have held that "Forced sales of stock to family members to enable them to pay estate taxes are in no way reflective of fair market value because the sales occurred under unusual circumstances."  See Estate of Oman v. Commissioner, T.C. Memo. 1987-71; see also Estate of Miller v. Commissioner, T.C. Memo. 1959-235.  Considering the relationship of the parties and petitioner's need for funds to pay the estate taxes, we find that Mannon was an accommodating buyer, not a willing buyer. Therefore, we do not consider the sale to Mannon in deciding the fair market value of petitioner's shares.

However, at the time petitioner sold the shares to Mannon, petitioner also sold 125 shares to Bozarth and 10 shares to Brown.  Bozarth is a director of Willits and Brown is an executive officer; both had their positions with Willits and were shareholders before they purchased these shares.  Furthermore, neither one has any relationship with either petitioner or March. We consider the price Bozarth and Brown paid evidence of the value of a minority interest in Willits.

Petitioner argues that a discount is warranted for the "gloomy state" of the 1991 economy, Willits' past history of economic loss, the absence of any real market for the shares, and the extended holding period required to dispose of petitioner's block.  Only petitioner's last two assertions have any basis in fact.

Willits' 1991 annual report to shareholders stated that it "will show a sizeable increase in profits" even though the "economy was such that the increase in deposits was very meager." In fact, Willits showed a 15-percent increase in net income compared to 1990.  Thus, Willits appeared to be weathering the gloomy state of the economy rather well.

Furthermore, petitioner's assertion that Willits has a history of economic loss is not supported by the record.  Mannon testified that he thought Willits actually may have suffered a negative income year in either 1981 or 1982, but that Willits performed well in the late 1980's.  We do not find Mannon's testimony supports a finding that Willits has a history of loss, and petitioner offered no other evidence to support this assertion.  Accordingly, we do not consider either of these assertions in deciding the value of petitioner's shares.

Both sides submitted expert witness reports and presented expert witness testimony in regard to the value of decedent's shares of Willits stock at the date of death.

Petitioner's Expert's Opinion

Petitioner's expert is Jeffrey T. Tarbell (Tarbell). Tarbell is a senior associate of Willamette Management Associates, and was a qualified expert at the time he prepared his report. Tarbell's testimony at trial was cryptic and unhelpful; we, therefore, rely upon only the written report for his opinion. Tarbell did not consider petitioner's sale of its stock in his analysis.

Tarbell selected nine publicly traded banks comparable to Willits as guideline companies and used the market method to value the Willits shares. Tarbell compared Willits' earnings per share for the last 12 months to the guideline companies' earnings per share for the same period, and selected four companies that had earnings growth rates similar to Willits. Using the companies' ratios for guidance, Tarbell selected a multiple to apply to Willits' earnings per share, and derived an indicated value of $902 per share. He repeated the same process with Willits' 5-year average earnings per share, and derived an indicated value of $945 per share.

Tarbell compared the guideline companies' dividend payout ratios to their dividend yields. He found that there was a relationship between the payout ratios and the dividend yields, and that the companies with higher payout ratios have higher dividend yields. Tarbell selected one company from the guideline

companies that had a payout ratio and an increase in its 12-month earnings similar to those of Willits, and applied its dividend yield rate to Willits' current dividend. This process produced an indicated value of $788 per share.

Tarbell analyzed the price-to-book value ratios and the current returns on equity of the guideline companies and found that there was a strong relationship between the ratios. He selected two companies that had returns on book value similar to Willits and determined that a multiple of 1.10 was appropriate to apply to Willits' book value. This process resulted in an indicated value of $887 per share.

Finally, Tarbell weighted the indicated values derived from the various valuation methods according to his opinion of their relative significance and concluded that the publicly traded minority value of Willits stock was $882 per share, before considering a discount for lack of marketability.

Tarbell opined that a 45-percent discount for lack of marketability was appropriate due to the limited market for Willits stock and the size of petitioner's block, and concluded that the fair market value of the stock was $485 per share. Petitioner's report does not state separately the amounts of the limited market and blockage components of the discount.

Tarbell cited the usual restricted stock and IPO studies,[22] and Rev. Rul. 77-287, 1977-2 C.B. 319, to support his opinion of the discount. Rev. Rul 77-287, supra, sets forth guidelines for valuing securities that cannot be immediately resold because they are restricted from resale pursuant to Federal securities law.

The Willits shares are not restricted from trading by either law or agreement. Petitioner offered no evidence of any shareholders who were unable to sell their shares once offered for sale. Therefore, there is no evidence that the low trading volume is due to any reason other than the shareholder's preference to hold the shares for long-term investment, rather than sale. Accordingly, we find no persuasive evidence in the record to justify reliance on the restricted stock studies in determining an appropriate marketability discount.

---

[22]In addition to the Emory IPO studies earlier cited by Gasiorowski and Spiro, see supra notes 9 and 16, Tarbell cited the following restricted stock studies: Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company", 36 J. Taxn. 353 (June 1972); Moroney, "Most Courts Overvalue Closely Held Stocks", 51 TAXES 144 (Mar. 1973); Moroney, "Why 25 Percent Discount for Nonmarketability in One Valuation, 100 Percent in Another?", 55 TAXES 316 (May 1977); Maher, "Discounts for Lack of Marketability for Closely Held Business Interests", 54 TAXES 562 (Sept. 1976); Trout, "Estimation of the Discount Associated with the Transfer of Restricted Securities", 55 TAXES 381 (June 1977); "Revenue Ruling 77-287 Revisited," SRC Quarterly Reports (Spring 1983); Bolten, "Discounts for the Stocks of Closely Held Corporations", 123 Trs. & Ests. 22 (Dec. 1984).

Furthermore, in considering the trading history of the shares, Tarbell did not consider petitioner's arm's-length sale of approximately 1.69 percent[23] of Willits' issued and outstanding shares at a price near book value to unrelated parties less than 10 months after decedent's death. Therefore, Tarbell did not consider all the evidence relevant to deciding the size of the discount. Accordingly, we give little weight to this portion of petitioner's opinion.

Respondent's Expert's Opinion

Respondent's expert is Spiro. In his report, Spiro used the market and income methods and considered the actual sales to value petitioner's Willits shares. Spiro ultimately concluded that the fair market value of the stock was $774 per share.

Spiro found five publicly traded bank companies that were sufficiently comparable to Willits to use as guideline companies for the market method of valuation. Employing the same methodology that he used to value the Savings shares, Spiro selected certain financial ratios to value the Willits shares. Weighting the price-to-earnings ratio 50 percent, the price-to-book ratio 40 percent, and the dividend yield measure 10 percent, Spiro derived an indicated value of $944 per share for a minority interest in Willits, if the shares were liquid and freely traded.

---

[23]This amount does not include the 365 shares sold to Mannon.

Spiro applied a liquidity discount to the indicated value. To determine the size of the discount, Spiro relied on the same studies and opinions that he relied upon in determining the size of the discount to apply to the Savings stock. He also considered the particular facts and circumstances of the Willits stock, including the level of Willits' public recognition in the local community, its history of paying increasing dividends, the lack of restrictions on trading the shares, the existing market for the stock, and the stock's trading history. Spiro concluded that a liquidity discount of 20 percent was appropriate, and that the fair market value of the stock was $755 per share.

Spiro used his piecemeal sales method to estimate the present value of the Willits shares in the same way that he used it to estimate the value of the Savings shares, except he assumed that 125 Willits shares could be sold each year for the next 4 years at a price approximating their book value at the time of sale. Using this method, Spiro concluded that the implied price per share was $816.

To value the shares by the income method, Spiro capitalized Willits' pro forma cash-flow. To calculate the pro forma cash-flow, Spiro made certain assumptions regarding Willits' 1992 net income, provision for loan losses, other operating income and expenses, income taxes, and additions to equity capital. He developed the discount rate to calculate the present value of the

pro forma cash-flow by reducing the rate of return that he thought an equity investor in Willits would require by 7 percent, his estimate of Willits' long-term growth rate.

Using this method, Spiro concluded that the minority value of the stock was $952 per share, before considering a liquidity discount. After applying the 20-percent liquidity discount, Spiro concluded that the fair market value of the stock was $732 per share.

To reconcile the results of the different methods, Spiro weighted the results of the piecemeal sales method 40 percent, the market method 35 percent, and the income method 25 percent, and concluded that the fair market value of the stock was $774 per share.

We accept part of respondent's expert's opinion and reject part. We reject the portion of the market method analysis in which Spiro calculated Willits' price-to-earnings multiple from the guideline companies' multiples because there is no statistically significant correlation between the selected companies' net income growth trends and their price-to-earnings multiples.[24]

---

[24]The selected companies and their growth trends and price-to-earnings ratios are as follows:

| Company | Growth Trends | | P/E Ratios |
| | 1-Year | 3-Year | |
| --- | --- | --- | --- |
| Redwood Empire Bankcorp | 148.56 | 32.22 | 9.02 |

(continued...)

- 48 -

In deciding the size of the discount, Spiro reviewed the conclusions of restricted stock and IPO studies, and considered the facts and circumstances of the Willits stock. We find no persuasive evidence in the record to support reliance on the restricted stock studies in determining an appropriate marketability discount.

In considering the particular facts and circumstances of the stock, Spiro found that Willits' publication of its annual report addressed to shareholders and other constituents is evidence that Willits has a high level of public recognition. We do not find that publishing its annual report supports a finding that Willits enjoyed a high level of public recognition.

Spiro concluded that there was an established market for the shares. The trading history of Willits stock does not support this conclusion. The evidence shows that except for decedent's sales, few shares were traded on an occasional basis, and most of the transactions were between family members, and Willits' directors, officers, and employees. We accord this part of Spiro's opinion little weight.

---

[24](...continued)

| | | | |
|---|---|---|---|
| First Commercial Bancorp | -25.91 | 11.64 | 5.75 |
| Civic Bancorp | -32.32 | 22.91 | 7.95 |
| California Bancshares, Inc. | -18.73 | 5.58 | 11.02 |
| University National Bank | 1.54 | 3.21 | 9.64 |

Finally, we reject the value Spiro obtained with his piecemeal sales method, because we think the method results in the value of the stock to a particular borrower, not the fair market value.

We think that petitioner's sale of 135 shares at arm's length to unrelated parties after decedent's death provides the best indication of the value of a minority interest in Willits. In this transaction, the shares were purchased by persons whom we presume have knowledge of the limits of the market and the value of a minority interest in Willits.

Moreover, Willits shares have historically traded at or near book value. In petitioner's sale, the shares sold for approximately 2.9 percent less than their book value at the time of sale. The book value provided this Court nearest the date of valuation was $806. Accordingly, we find that the value of a minority interest on the date of valuation was $783, before applying a discount for blockage.

The market for the Willits' shares was limited, and petitioner could not have sold its block of shares in a reasonable period of time without depressing the market and lowering the price. Accordingly, we apply a 20-percent discount for blockage and find that the fair market value of the Willits stock is $626 per share.

Issue 3.  Whether Petitioner May Deduct the Expense of Defending
          Its Reporting Position

Petitioner asserts by amended petition that certain expenses it incurred defending its reporting position with regard to the value of the Savings and Willits shares are administration expenses deductible from the value of the gross estate. Respondent did not address this issue at trial or on brief.

Section 2053(a)(2) provides that administration expenses shall be deducted from the value of the gross estate if they are allowable by the law of the jurisdiction under which the estate is being administered.  Administration expenses include attorney's fees and miscellaneous expenses.  See sec. 20.2053-3(a), Estate Tax Regs.  Miscellaneous administration expenses include accountant's fees and appraiser's fees.  See sec. 20.2053-3(d)(1), Estate Tax Regs.  The amounts deductible as administration expenses are limited to such expenses as are actually and necessarily incurred in the administration of the decedent's estate.  See sec. 20.2053-3(a), Estate Tax Regs. However, expenditures not essential to the proper settlement of the estate but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions.  See id. Attorney's fees incurred by beneficiaries incident to litigation as to their respective interests are not deductible if the

litigation is not essential to the proper settlement of the estate. See sec. 20.2053-3(c)(3), Estate Tax Regs.

California law allows the personal representative to employ tax experts in negotiations or litigation that may be necessary for the final determination and payment of taxes and to pay the experts from the funds of the estate.[25] The litigation undertaken by petitioner in this case was in response to respondent's determination of a deficiency in petitioner's Federal estate tax. The litigation did not relate to the respective interests of the heirs, nor was it incurred for their individual benefit. Accordingly, we conclude that the administrative expenses petitioner claims are of the type that are allowable under California law and the regulations.

Respondent's regulations provide that a deduction for attorney's fees incurred in contesting an asserted deficiency or

---

[25]California law provides:

> The personal representative may also employ or retain tax counsel, tax auditors, accountants, or other tax experts for the performance of any action which such persons, respectively, may lawfully perform in the computation, reporting, or making of tax returns, or in negotiations or litigation which may be necessary for the final determination and payment of taxes, and pay from the funds of the estate for such services. [Cal. Prob. Code Ann. sec. 10801(b) (West 1998).]

These amounts are in addition to the compensation allowed under Sec. 10800 for all ordinary services of the personal representative. See Cal. Prob. Code Ann. sec. 10801(a) (West 1998).

in prosecuting a claim for refund should be claimed at the time the deficiency is contested or the refund claim is prosecuted. See sec. 20.2053-3(c)(2), Estate Tax Regs.  Furthermore, a deduction for these fees shall not be denied, and the sufficiency of a claim for refund shall not be questioned, solely by reason of the fact that the amount of the fees to be paid was not established at the time that the right to the deduction was claimed.  See id.

Petitioner has met the requirements for claiming the deductions.  Petitioner paid $21,226 of attorney's fees, $8,830 of accountant's fees, and $12,396 of appraisal costs to defend its reporting position in an audit by the Internal Revenue Service.  Petitioner filed Form 843, Claim for Refund and Request for Abatement, to claim a refund of the estate tax paid on these amounts soon after filing its petition in this case.  At that time, petitioner also filed a protective claim for refund of estate tax for additional administration expenses that it expects to incur in further defending its position.

Respondent did not address this issue either at trial or on brief. Accordingly, we find that petitioner may deduct the reasonable administration expenses incurred in settlement of the estate.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.